**DELOITTE & TOUCHE NETHER-LANDS ANTILLES AND ARUBA and Deloitte Touche Tohmatsu, Appellants,**

v.

**Hans Jurgen Gustavo ULRICH, et al., Appellees.**

No. 09–04–449 CV.

Court of Appeals of Texas, Beaumont.

Submitted April 7, 2005.

Decided Aug. 25, 2005.

M. Byron Wilder, C. Glen Morris, Aaron R. Miller, Gibson, Dunn & Crutcher, LLP, Dallas, Mark B. Holton, Gibson, Dunn & Crutcher, LLP, New York, NY, for appellants.

Gerald T. Drought, Edward C. Snyder, Karla R. Pascarella, Martin, Drought & Torres, Inc., San Antonio, for appellee.

Before McKEITHEN, C.J., GAULTNEY and KREGER, JJ.

## OPINION

DAVID GAULTNEY, Justice.

The issue in this interlocutory appeal is whether the trial court has personal jurisdiction over two defendants. Fifty-four investors have sued various individuals, a bank, an accountant, an accounting firm, and an international association of accounting firms for wrongful conduct associated with an allegedly fraudulent securities scheme. The investors assert various causes of action, including negligence, negligent misrepresentation, aiding and abetting fraud, conspiracy, conversion, aiding and abetting violations of the Texas Securities Act, and breach of fiduciary duty, against Deloitte & Touche Tohmatsu (DTT), an association of accounting firms, and Deloitte Touche Netherlands Antilles and Aruba (DTNA), an accounting firm. Plaintiffs' claims against DTNA and DTT concern audits of Integra Bank.

DTNA and DTT challenged the Texas court's jurisdiction. The trial court denied their special appearances, and DTNA and DTT filed this accelerated interlocutory appeal. *See* TEX. CIV. PRAC. & REM.CODE ANN. 51.014(a)(7) (Vernon Supp.2005). We affirm.

### PERSONAL JURISDICTION

The investors—plaintiffs and intervenors in the trial court—assert the trial court has specific and general jurisdiction over DTT and specific jurisdiction over DTNA as a result of business contacts in Texas. For specific jurisdiction over DTNA, plaintiffs point to the following contacts: DTNA representatives' trips to

The Woodlands, Texas, for audit work relating to Integra Bank and other entities; regular communications and contacts on matters essential to the audits with Integra Bank management and related entities in The Woodlands, Texas; and communications and contacts with other Texas-based professionals and companies on matters related to the Integra Bank audits. Plaintiffs allege DTNA and DTT committed torts in Texas, and point out that the money plaintiffs lost in the allegedly fraudulent scheme was held by and transferred through accounts in Texas. Plaintiffs also assert that the Texas contacts of Deloitte and Touche entities should be attributed to DTT under parent/subsidiary, alter ego, agency, and joint enterprise theories, and that DTT itself has employees and an office in Texas.

■■■ The Texas long-arm statute provides for the exercise of jurisdiction over non-resident defendants. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). The statute extends as far as the federal constitution permits. *See generally Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 788, 795 (Tex. 2005). Therefore, courts focus on the federal constitutional due process requirements for the exercise of personal jurisdiction. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). Under the due process clause, jurisdiction is proper if a nonresident defendant has "minimum contacts" with Texas, and maintenance of the lawsuit does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *American Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002). The "minimum contacts" analysis requires " 'some act by which the defendant purposefully

avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

■■■ The touchstone of the jurisdictional due process analysis is the "purposeful availment" requirement. *See Michiana,* 168 S.W.3d at 784. Due process precludes a nonresident defendant from being haled into a jurisdiction solely on the basis of random, fortuitous, or attenuated contacts, or because of the unilateral activity of another party or a third person. *See Burger King,* 471 U.S. at 475, 105 S.Ct. 2174; *American Type Culture Collection,* 83 S.W.3d at 806. Foreseeability is a factor to consider, but foreseeability alone will not support personal jurisdiction. *CSR Ltd. v. Link,* 925 S.W.2d 591, 595 (Tex.1996). The " 'foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.' " *Burger King,* 471 U.S. at 474, 105 S.Ct. 2174 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

■■■ Personal jurisdiction may be either general or specific. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990). General jurisdiction requires that a defendant's purposeful contacts in a forum state be continuous and systematic. *See BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 796 (Tex.2002). The contacts or activities must be substantial such that the State is justified in exercising power over the nonresident as though it were a resident; that is, in the general jurisdiction context, jurisdiction exists even if the

claim does not arise from or relate to the activities conducted within the State. *Id.; see also CSR*, 925 S.W.2d at 595. Specific jurisdiction over the defendant "is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum." *BMC*, 83 S.W.3d at 796.

 Whether the trial court has personal jurisdiction over a defendant is a question of law. *American Type Culture Collection*, 83 S.W.3d at 805–06. In resolving this question of law, a trial court must sometimes resolve questions of fact. *Id.* at 806. The focus should be on the defendant's contacts with the State, rather than on the underlying merits of the case. *Michiana*, 168 S.W.3d at 790–92. An appellate court reviews a jurisdictional determination *de novo*. *American Type Culture Collection*, 83 S.W.3d at 805–06.

### THE INTERAMERICAS GROUP

Plaintiffs are Mexican citizens, residents, or business entities that invested in Integra Bank. Integra Bank was incorporated as a Netherlands Antilles bank on July 26, 1990, and engaged in international banking business. No one from Curacao, Netherlands Antilles, held an account in the bank. Part of a group called InterAmericas, Integra Bank had most of its money invested in loans. Plaintiffs invested in the InterAmericas Group and were informed their accounts were managed by and through InterAmericas' personnel in The Woodlands, Texas.

The InterAmericas is a group of domestic and offshore companies owned or controlled by Hugo Pimienta, his family, and three other partners. Pimienta and the partners in the "Group" also controlled and operated Integra Bank from The Woodlands and made all major decisions regarding loans and investments for the bank. Although two of Integra Bank's directors were located in the Netherlands Antilles, some, if not most, of the business and accounting operations were conducted in The Woodlands. Investors' funds were held in Integra Bank's name at banks in Texas.

The "administrative operations" and "back office accounting" for Integra Bank were "out-sourced" to Texas companies, first IBI and later Gamma Capital Services, both in Houston or The Woodlands. Both IBI and Gamma were companies in the InterAmericas Group. Integra Bank's general ledger, source documentation (loan files, "bank statements," payroll data of personnel), and internal controls were in Curacao. The trial balances and subledgers were partially kept in Houston and partially in Curacao. Most, if not all, of the administrative functions were conducted in Houston: the Bank's customer statements were printed and sent out from Texas though the process was coordinated by the local management in Curacao; the trial balance data originated in Texas and was sent to Curacao from Texas; customer orders and transactions were processed in Houston; confirmations for Integra Bank went directly from Houston to the customers; and reconciliation of the various transactions was done in Houston. There is also evidence that Jerry Simpson, the in-house accountant in Texas for the InterAmericas Group, used the accounting support information generated in Texas to prepare the financial statements for Integra Bank. Further, one of DTNA's auditors testified, "I don't know the exact percentage but once the back office operations were being done in Houston, it's ... only logical that most of the accounting would be done there."

### DTNA AND DTT

DTNA, an accounting firm organized under the laws of the Netherlands Antilles,

has no offices, telephone numbers, mailing addresses, bank accounts, business agents, taxpayer identification numbers, agents for service of process, real property, or personal property in Texas. No partner or employee resides in Texas. With the exception of the specific contacts with Texas in this case, DTNA does not solicit business or advertise in Texas and has not entered into any contracts to perform services in Texas.

DTT, a Swiss verein, is described by DTT as a membership association composed of individual accounting firms that conform to the verein requirements and use the international Deloitte Touche practice name granted to the local firms by DTT. DTNA is a member of the verein, as is Deloitte & Touche–U.S. Appellees assert DTT has individual firm employees who are "seconded" to the verein and who do the verein's work in its office in Houston, Texas. DTT asserts it has no offices, "salaried" employees, property, telephone numbers, mailing addresses, bank accounts, licenses to do business, or agents for service of process in Texas, and does no "commercial" business in Texas. Instead, DTT borrows its Texas office and employees from a member firm and reimburses the member firm its costs at the end of the year.

## THE AUDITS

Over a three-year period from 1997–1999, DTNA contracted to audit Integra Bank. DTNA knew from the first meeting with Integra Bank's representatives in 1997 that the majority of the bank's accounting records were not maintained in Curacao. DTNA concedes this practice was a violation of the banking regulations in the Netherlands Antilles. DTNA knew the firm would have to evaluate the organization of the bank's Texas accounting.

Anthony Cijntje, a partner in DTNA, communicated with Integra Bank's Roberto Canales regarding DTNA's acceptance of the audit responsibilities while Canales was in Texas. DTNA representatives met with the "back office" personnel in The Woodlands. While in The Woodlands, DTNA representatives conducted interviews with personnel at Gamma Corporation regarding DTNA's evaluation of the accounting procedures being done there by Gamma for Integra Bank. DTNA checked the customers' statements to determine whether they had been shipped correctly; while in Texas, DTNA representatives conducted and "checked out" the "confirmation" process. Cijntje, a DTNA partner, testified the internal controls had to be tested both in Curacao and Houston to comply with GAAP (Generally Accepted Accounting Principles), while Alvin Francisco, a DTNA employee, said DTNA could rely on the report of the Texas service provider's auditor, and a trip to Texas was unnecessary. Plaintiffs' accounting expert testified an on-site visit to Texas would be necessary to observe the application of internal controls. Regardless, the purpose of DTNA's trips to Houston was to see whether the "out-sourced" administrative operations existed, how they functioned, and to what extent DTNA needed to take those into account for its audit in Curacao.

## DTNA—SPECIFIC JURISDICTION

Plaintiffs rely on *Gutierrez v. Cayman Islands Firm of Deloitte & Touche,* an accounting malpractice case, to support the trial court's finding of specific jurisdiction over DTNA. *Gutierrez,* 100 S.W.3d 261 (Tex.App.-San Antonio 2002, pet. dism'd). InverWorld, an investment firm organized under Cayman law but headquartered in San Antonio, contracted with DT–Cayman to serve as InverWorld's independent accounting and auditing firm for each of five years. *Id.* at 265–66. InverWorld main-

tained a place of business in Texas, and the contract between InverWorld and DT–Cayman apparently was made performable in Texas. *Id.* at 271. DT–Cayman had no offices, property, or employees in Texas. *Id.* at 266. InverWorld's offices, books, records, and computers were all located in San Antonio. *Id.* at 269. DT–Cayman engaged the Texas branch of DT–US to perform the bulk of the auditing work in San Antonio. *Id.* at 266, 270. Although DT–Cayman never sent its employees to Texas, DT–Cayman asked for clarification on the audit work when necessary, examined the audits carried out by DT–Texas, retained the right to grant final approval, and issued the final auditor's report each year. *Id.* at 270. DT–Cayman placed hundreds of faxes and phone calls and wrote letters to DT–Texas and InverWorld in San Antonio. *Id.* Based on these facts, the *Gutierrez* court found DT–Cayman's activities were purposefully directed at Texas. *Id.* at 272–273.[1] The court explained that "because DT–Cayman knew it was serving a firm managed entirely in San Antonio," DT–Cayman "would be hard pressed to argue its relationship with Texas was random, fortuitous, or attenuated." *Id.* at 273.

 Like InverWorld, Integra Bank was organized under foreign law, and, like InverWorld, Integra Bank contracted with a Deloitte Touche firm in the country of its origin to perform audit work. In both instances, substantial portions of the work had to be done in Texas. In *Gutierrez,* DT–Cayman contracted with the Texas branch of Deloitte Touche–U.S. to do audit work at InverWorld's San Antonio headquarters; DT–Cayman did not send any employees to Texas to handle that audit work. *Id.* at 266, 270. Integra Bank was not headquartered in Texas, but the record

reveals administrative and accounting functions for the bank were handled in Texas by other companies in the InterAmericas Group. The trial court reasonably could have concluded from the evidence presented that a significant part of the Group's primary operations, including those of Integra Bank, were centered in Texas. Integra Bank engaged DTNA to do the bank's audits for 1997, 1998, and 1999. Unlike DT–Cayman in *Gutierrez,* DTNA did not contract with DT–U.S. to do the Texas portion of Integra's audit. Instead, DTNA sent one of its partners, along with other senior DTNA accountants, to Texas to personally handle that portion of the work here.

The issue presented is whether DTNA purposefully availed itself of the benefits of doing business in Texas, or whether, as DTNA argues, the Texas business contacts are the result of the unilateral activity by a third party and fortuitous. DTNA admits it knew from the time it accepted the audit assignment that a major part of the accounting for Integra Bank was done in Texas in violation of applicable banking regulations in the Netherlands Antilles. DTNA representatives came to Texas to evaluate the accounting functions being done in Texas. A DTNA representative communicated with a key Integra Bank official in The Woodlands. The other companies doing the accounting for the bank were also members of the Group, and DTNA representatives met with representatives of IBI (a Group member and one of the companies providing the accounting in Texas for Integra Bank) regarding the audit. Integra Bank was controlled by Group partners in The Woodlands. It is undisputed that DTNA expected to profit from its activities in Texas and received a benefit from that work as part of its audit

---

1. *But see Michiana,* 168 S.W.3d at 790 (Personal jurisdiction is based on a defendant's contacts with the State, not where defendant "directed a tort.").

of Integra Bank. On this record, the trial court reasonably could have concluded DTNA purposefully availed itself of the privileges of conducting those specific business activities in Texas, thus invoking the benefits and protections of the laws of Texas. DTNA could reasonably have anticipated that a Texas court would have jurisdiction over DTNA to govern DTNA's conduct arising specifically out of its work in Texas for a bank that centered many of its activities in Texas.

The pleadings and evidence show plaintiffs' causes of action arise from DTNA's specific business contacts with Texas. Plaintiffs claim the defendants were negligent in performing the audit work, in determining that a control-based audit was sufficient for Integra Bank's audit, and that use of this audit approach was part of the effort to further the defendants' fraudulent securities scheme against the investors. There is evidence in the record that DTNA's decision to perform a control-based audit of Integra Bank, and therefore the audit itself, relied on work performed by DTNA in Texas. Plaintiffs maintain that had defendants conducted their audits in accordance with GAAP and GAAS[2] standards, the audits would have revealed the true status of Integra Bank's financial and operating condition, and plaintiffs would never have invested their money with the Group, or they would have withdrawn their funds and invested elsewhere. Affidavits by the plaintiffs attest to their reliance on the audits. We do not address the merits of plaintiffs' claims. We hold only that DTNA's business contacts with Texas support specific jurisdiction over DTNA on the specific claims arising out of those activities conducted in Texas.

## DTT—GENERAL JURISDICTION

 Plaintiffs maintain the trial court has general and specific jurisdiction over DTT. We address only the general jurisdiction question because it is dispositive.

DTT is a "verein" headquartered in Zurich, Switzerland. The verein has individual accounting firm members, such as DTNA and DT–US, that pay the verein a small percentage of net revenues as a "subscription fee" which, in turn, funds the verein's global operations. The DTT verein has a board comprised mainly of the managing partners of the member firms. The verein owns the name "Deloitte & Touche" and lends that name through a license agreement to individual firms such as DTNA and DT–US. Assigned a specific territory, the individual firms use the "brand" name on their business cards, correspondence, and work product. All of the member firms manage themselves locally. DTT does not provide any audit, tax, or consulting services to the individual firms' clients.

The verein's goals include, among others, adherence by member firms to the highest professional standards; the fostering of international alignment, cooperation, and cohesion among the member firms; and advancement of international and national leadership of the member firms in rendering professional services. Every year the individual firm goes through a strategic planning process to confirm the firm's training is aligned with requirements of the law. Regional managing partners go to the local firms, review and comment on the firms' plans, and ultimately report back to the firms on the adequacy of those plans.

2. GAAP refers to Generally Accepted Accounting Principles; GAAS refers to Generally Accepted Auditing Standards.

Plaintiffs' pleadings assert the Texas district court has general jurisdiction over DTT, in part because DTT has an office in Texas and has continuously and systematically conducted business in the State. DTT maintains it does not have offices, salaried employees, property, telephone numbers, mailing addresses, bank accounts, licenses to do business, agents for services of process, or taxpayer identification numbers in Texas. DTT says it has not conducted any "commercial business" in Texas. In fact, a DTT representative stated, "DTT has no clients and it has no employees. It has no presence in the U.S." Rather than engaging in what it calls "commercial business," DTT asserts it "provides services only to its member firms."

■ DTT's corporate representative, Ben Anderson, testified he is a partner in the Deloitte & Touche U.S. firm (Deloitte & Touche LLP). Anderson explained that the cost of his office is paid for by DTT; at the end of the year, DTT reimburses the U.S. firm both for his office space and his time. He explained:

> I have been completely seconded to Deloitte & Touche Tohmatsu [DTT]. I am 100 percent seconded to [DTT], which means that my duties in the U.S. firm are next to nothing. At the end of the year [DTT] then reimburses the U.S. firm for my partnership earnings.

As used here, "seconded" means the loaning of an employee by an employer to another to perform work on behalf of the second employer. Under Texas law, a general or regular employee of one employer may become the borrowed employee of another. *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 537 (Tex.2002). If the other employer has the right to direct and control the details of the particular work, the person becomes the employee of the other. *Id.*

Anderson's office is in Houston, and he has been 100% seconded or loaned there to DTT for over ten years.[3] He reports to another partner who in turn reports to the CEO of DTT. In the same Houston office, there are three other Deloitte U.S. employees who are also seconded to DTT.

Anderson works from his Houston, Texas, office as "managing partner of the Latin American region" and advises those regional member firms "on the development of their tax practices in their respective countries." A large part of his responsibility at DTT is to "help the member firms grow by targeting, marketing, sales, growth.... That's how the verein will grow, by growing the members firms." Anderson goes to the individual firms, reviews and comments on their plans, and evaluates the adequacy of those plans. His other function is to "develop learning modules on tax issues for the benefit of member firms around the world." Julie Marshall is another Deloitte U.S. employee seconded to DTT in Houston. From the Houston office, Marshall, as "learning director for Latin America," organizes, coordinates, and facilitates the training for member firms of the Latin American region. In performing their functions for DTT, both Anderson and Marshall help to advance the stated purposes of the verein.

DTT argues it has no continuous and systematic business contacts with Texas because, among other things, it has no

---

3. Ben Anderson describes his length of secondment as follows:
"I was first seconded from the U.S. firm to DTT in about 1992, 1993. I worked there continuously until 2003. At that time I became 100 percent back into U.S. firm. And then starting in 2004, I believe it was sometime in 2004, the dates aren't exact, I came back into DTT. So I was only out one year. Since '92–93. So it's been ten-plus years."

"salaried employees" in Texas, and the seconded people in Texas do not engage in work to develop Texas business or exploit Texas markets. However, under Texas law the seconded personnel in Texas are considered DTT employees, and their work is DTT work ultimately paid for and controlled by DTT. *See generally St. Joseph Hosp.*, 94 S.W.3d at 537–38. The sole test is not, as DTT would have it, whether DTT does "commercial" business in Texas and has "salaried" employees in Texas. As DTT explains, it does no "commercial" business anywhere; its "business" is to service its member firms. Under Texas law, the 100% seconded employees are considered employees, though borrowed, of DTT. *Id.* A foreign association that sets up what is, in effect, a permanent office in Texas, and uses this base for conducting out-of-state or global business, could reasonably anticipate a Texas court may exercise general jurisdiction over the firm. Though Texas is not DTT's headquarters, DTT's contacts with Texas are substantial; that is, they are comparable to the activities of a resident business using Texas as a base of operations.

In *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), a foreign corporation temporarily carried on in Ohio a continuous and systematic, but limited, part of the general business. *Id.*, 342 U.S. at 438, 72 S.Ct. 413. The cause of action asserted in Perkins did not arise out of the corporations's activities in Ohio. *Id.* at 446–47, 72 S.Ct. 413. The company's mining properties were located in the Philippine Islands, and its operations there were completely halted during the Japanese occupation of the islands during World War II. *Id.* at 447, 72 S.Ct. 413. The company's president, who was also the general manager and principal stockholder, returned to his Ohio home. *Id.* "There he maintained an office in which he conducted his personal affairs and did many things on behalf of the company." *Id.* at 447–48, 72 S.Ct. 413. He kept company files there. *Id.* at 448, 72 S.Ct. 413. He carried on correspondence relating to the company's business and to company employees, and distributed salary checks to himself as president and to two company secretaries who worked there with him. *Id.* He maintained two bank accounts containing substantial balances of company funds. *Id.* Several directors' meetings were held there. *Id.* From his Ohio office, he also supervised policies dealing with the company's rehabilitation of the Philippine properties and sent funds to buy equipment for the reconstruction. *Id.*

The Supreme Court held "he carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company." *Id.* Although the corporation did not own or operate any mining properties in Ohio, many of its wartime activities were directed from Ohio and were given the personal attention of its president in Ohio. *Id.* The Supreme Court found these were minimum contacts sufficient for the exercise of general jurisdiction by a court in Ohio should the Ohio court choose to assert jurisdiction. *Id.*

In *American Type Culture Collection*, the Texas Supreme Court considered whether a Texas court had general jurisdiction over a foreign corporation organized under District of Columbia laws with its principal place of business in Maryland. *American Type Culture Collection*, 83 S.W.3d at 807. The corporation advertised in national and international journals, sold products to Texas residents for at least eighteen years, served as a repository for Texas researchers, contracted with a Texas medical center, and signed a repository contract in Maryland. *Id.* at 807–08. All of the services related to the repository contract were performed in Maryland. *Id.*

The corporation also purchased approximately $378,000 of supplies from thirty-three Texas vendors, and the corporation's representatives attended five conferences in Texas. *Id.* at 808. Unquestionably, there were contacts with Texas, but there was no pattern of continuing systematic activity. *Id.* at 809. Relying on *CSR Ltd.*, 925 S.W.2d at 595, the Texas Supreme Court focused on the fact that the corporation had no physical presence or office in Texas, did not advertise in Texas, performed all of its business services outside Texas, and carefully constructed its contracts to ensure it did not benefit from Texas laws. *American Type Culture Collection*, 83 S.W.3d at 810. The Supreme Court found the corporation did not have sufficient minimum contacts with Texas. *Id.*

This case is distinguishable from *American Type Culture Collection* and more closely resembles *Perkins*. DTT has a physical presence in Texas, and staffs its borrowed office with a partner and employees seconded to DTT. As the managing partner for the Latin American region who gives advice to member regional firms, and as the seconded partner assisting the member firms globally, Ben Anderson uses Texas as his base of DTT operations. Julie Marshall functions for DTT as a facilitator for training programs, and she does so out of the Houston office. Various faxes and e-mails in the record demonstrate her planning and communication from the Houston office on the field service training programs.

We focus on the nature and quality of DTT's contacts. See *American Type Culture Collection*, 83 S.W.3d at 806. DTT has a physical presence in Texas. In describing the Houston office, Anderson stated as follows:

A. What would happen, would be at the end of the year, the employees or the partner on secondment, which would be me, there would be a reimbursement to . . . the U.S. firm for my time. So nothing would go to the Houston office as a result of reimbursing for my time. I'm not part of the Houston office at all. I do have an office in Houston. So what they do, is they allocate a certain percent of the office space, based on actual cost, and they reimburse it at year end.

. . . .

For me and the one, two, or three or four people that are in Houston, that are employees.

Q. All right. And you said you do have an office in Houston?

A. Yes, I do.

In an affidavit filed after his deposition, Anderson made clear he and four employees in the Houston office are seconded to DTT.

Contrary to DTT's assertion, DTT's physical presence and contacts in Texas are not haphazard, sporadic, tenuous, isolated, or fortuitous, such that DTT could not have reasonably anticipated being haled into a Texas court. Regardless of whether the office could have been located in some other state or country, or was originally intended as a permanent presence, it is apparent from the record that DTT has maintained an office in Texas for over ten years and has staffed it with seconded employees working for DTT and using Texas as a base for DTT's work.

Appellants rely on the holding in *Gutierrez* that a Texas court did not have personal jurisdiction over DTT. *Gutierrez*, 100 S.W.3d at 270. The *Gutierrez* plaintiffs argued the Texas trial court had specific jurisdiction over DTT, because it "acted as a conduit" for activities in Texas. *Id.* at 268. On that record, the *Gutierrez* court found that, aside from maintaining a web-

site and lending its name to multiple accounting firms, DTT had no relationship to the transactions in that case. *Id.* DTT performed none of the work, had no interaction with the party for whom the audit was conducted, and did not perform any services for DT–Texas or DT–Cayman in connection with the audit. *Id.*

*Gutierrez* is not a general jurisdiction case. The record here establishes DTT has an actual physical presence in Texas through a Texas office and through the conduct of DTT's business by the seconded employees in Texas. The *Gutierrez* court made no mention of DTT seconded employees doing their work out of a Texas office ultimately paid for by DTT, and the record in that case may not have included this information. See *id.*

Appellants also rely on *Alenia Spazio, S.p.A. v. Reid,* 130 S.W.3d 201 (Tex.App.-Houston [14th Dist.] 2003, pet. filed). Reid, a Canadian citizen, filed suit in Texas against several defendants, including two Italian companies organized under the laws of Italy and headquartered in Rome. *Id.* at 206. Alenia, one of the Italian companies, had contracts relating to the Space Station Project with the Italian Space Administration, the European Space Administration, and a German space agency. *Id.* at 218. "NASA, rather than the Italian Companies, decided that some of Alenia's services under the contracts with three European entities would be performed at the Space Center." *Id.* The Italian companies had an office and employees at the Space Center in Houston for four years. *Id.* at 216–217. Over one hundred employees of the Italian company traveled to the Space Center in connection with the Space Station project. *Id.* at 216. Numerous communications were directed to individuals at the Space Center in connection with the project, and on at least two occasions, one of the Italian companies sent a ship-

ment from Italy to the Space Center. *Id.* The *Alenia* court noted that simply "having an office in the forum state does not require a finding of general jurisdiction." *Id.* at 217. The significance of the contact depends on the "type and nature" of the office maintained in Texas. *Id.* Nothing in the record suggested the Italian companies made any efforts to exploit Texas markets. *Id.* They had no bank accounts or listings in any public telephone directory in Texas, had not paid taxes or franchise fees in Texas, did not regularly advertise in Texas, and had no authorized agents to accept service of process in Texas. *Id.*

The facts in *Alenia* are distinguishable from those here. The DTT office is not a temporary presence. It is not the unilateral result of some other company's decision. In *Alenia,* the court stated, "If a defendant maintains a permanent general business office through which it solicits business in Texas, then this factor tends to weigh strongly in favor of general jurisdiction." *Id.* at 217. DTT does not "solicit" commercial business in Texas, or anywhere, because that is not its function. DTT's purpose is to service its members, and it receives a small percentage of each member's net revenues as a subscription fee to permit it to do so. A limited part of its business activity is conducted continually and systematically from a Texas base of operations, ad is of such a substantial nature and quality as to justify suit against DTT here. We hold the record here demonstrates sufficient minimum contacts to support general jurisdiction over DTT in Texas.

### FAIR PLAY AND SUBSTANTIAL JUSTICE

We must next consider whether the exercise of jurisdiction over DTNA and DTT by a Texas court would nevertheless offend traditional notions of fair play and substantial justice. *Guardian Royal*

*Exch.*, 815 S.W.2d at 228–33. In the context of a dispute involving a foreign defendant, four factors are relevant: (1) the unique burdens placed on a defendant that must defend itself in a foreign legal system; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and efficient relief; and (4) the procedural and substantive policies of other nations whose interests are affected as well as the federal government's interest in the policies. *Id.* "Only in rare cases ... will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Id.* at 231; *see, e.g., State of Rio de Janeiro of The Federative Republic of Brazil v. Philip Morris, Inc.*, 143 S.W.3d 497, 500–04 (Tex.App.-Beaumont 2004, pet. denied).

Appellants argue that having to litigate far from home is burdensome and would entail the gathering of evidence in Mexico, as well as proof of Mexican law. The burden of defending this case is not unique to Texas; the same evidence gathering burden would exist if plaintiffs sued in Switzerland, New York, or the Netherlands Antilles. Moreover, DTNA sent its representatives to Texas for each of three accounting years to evaluate and audit the accounting functions performed in Texas by Texas companies. Witnesses regarding the Texas portion of the audit would most likely be located in Texas. As to DTT, it is a global association with individual firm members located around the world, and it has representatives and an office in Texas. In view of this physical presence in Texas, litigating here would not be unduly burdensome or unique.

Appellants argue Texas has no interest in providing a forum for the claims. However, the plaintiffs' pleadings allege appellants were involved in misconduct concerning audits of a company with a substantial base of operations in Texas. The evidence shows DTNA's work was conducted at least in part in Texas, and DTT has a place of operations in Texas. As the San Antonio court explained in *Gutierrez,* "Texas has a strong interest in assuring the integrity of investment firms that choose to operate in the state, and we cannot permit this state to be used as a base of operations by corporations seeking shelter from our securities laws or from lawsuits." *Gutierrez,* 100 S.W.3d at 274. Likewise, Texas has an interest in the trustworthiness of the audit work performed in part in Texas for diversified firms operating in Texas.

The plaintiffs themselves have an interest in adjudicating their claims in Texas. The InterAmericas Group, the entity at the hub of the causes of action, and most of the individual defendants, are located in Texas. The plaintiffs' accounts were managed by and through InterAmericas' personnel located in Texas. Appellants conducted activities in Texas—one as part of a specific project and the other on an ongoing basis.

Under the fourth prong, appellants argue that requiring DTNA to answer claims in Texas would offend the sovereign interest of the Netherlands Antilles. *See Guardian Royal Exch.,* 815 S.W.2d at 228–29. Given DTNA's purposeful business contacts with Texas and the interest of Texas in assuring the integrity of investment firms operating in Texas, we fail to see on this record how comity concerns are implicated.

We hold the trial court's exercise of jurisdiction comports with traditional notions of fair play and substantial justice. We affirm the trial court's ruling as to its

270

jurisdiction over DTNA and DTT. The stay order issued by this Court is vacated.

AFFIRMED.