**RSR CORPORATION and Quemetco Metals Limited, Inc., Appellants,**

v.

**Andreas SIEGMUND, Inppamet S.A. a/k/a Inppamet LTDA and Plastic and Metal Parts, Inc., Appellees.**

No. 05–09–00571–CV.

Court of Appeals of Texas, Dallas.

March 26, 2010.

---

William A. Brewer III, Michael Scott Gardner, Bickel & Brewer Storefront, PLLC, Melissa S. Yost, Dallas, TX, for Appellants.

Russell H. Roden, Nesbitt, Vassar, McCown & Roden, LLP, Addison, TX, Karen D. Smith, Drucker, Rutledge & Smith, L.L.P., The Woodlands, TX, for Appellees.

Before Justices FITZGERALD, MURPHY, and THOMAS.[1]

## OPINION

Opinion By Justice MURPHY.

In this suit involving allegations of misuse of confidential information, appellants RSR Corporation and Quemetco Metals Limited, Inc. appeal the trial court's orders granting (1) the special appearances of appellees Inppamet S.A. a/k/a Inppamet Ltda. (Inppamet) and Plastic and Metal Parts, Inc. (PlaMetCo) and (2) the motions to dismiss of Inppamet and PlaMetCo, joined by appellee Andreas Siegmund, based on both a forum-selection clause and

---

1. The Honorable Linda Thomas, Chief Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

the doctrine of forum non conveniens. We reverse the trial court's two orders and remand this case for further proceedings.

## BACKGROUND

RSR is a Delaware corporation with its primary office in Dallas, Texas. RSR is a subsidiary of Quexco Incorporated, a private holding company, and engages in the recycling, smelting, and refining of various non-ferrous metals, such as lead, copper, aluminum, nickel, and zinc. Quemetco, a Texas corporation and wholly-owned subsidiary of RSR, with its primary office in Dallas, engages in secondary lead smelting and refining. RSR and Quemetco manufacture and market anodes produced through the electrowinning process. Electrowinning is described as "a process whereby metals, such as lead, copper, nickel, and zinc are recovered from liquid solutions."

### Siegmund's Employment with RSR and Quemetco

Siegmund, a Texas resident, worked for RSR from 1998 to 2005 and served as president of Quemetco from 2005 to August 2008. As part of his employment, Siegmund signed certain employment agreements, including a non-disclosure agreement and a conflicts of interest agreement. Siegmund signed a new non-disclosure agreement each year; the last agreement was signed on August 11, 2008.

Pursuant to the non-disclosure agreement, Siegmund could not "publish articles concerning, lecture upon, use, disseminate, disclose, or otherwise communicate any Confidential Information to any Person" without consent. The non-disclosure agreement defined "Confidential Information" broadly and included the business of RSR and its present and future subsidiaries or affiliates.

The conflicts of interest agreement prohibited Siegmund from engaging or participating in the "ownership, management, operation, or control of or be[ing] connected as a director, officer, employee, agent, partner, joint venturer, or otherwise with any business or organization" that competes with RSR. Siegmund also agreed not to "accept compensation from any source other than the Company for the performance of his duties and responsibilities as an employee of the Company." Siegmund signed annual certificates, in which he acknowledged the conflicts of interest agreement and stipulated he had not participated in any activity "which might conflict with the Company's interests . . . ."

Approximately two weeks after signing his last non-disclosure agreement in August 2008, Siegmund left Quemetco to work for PlaMetCo, an Arizona corporation and affiliate of Inppamet. Siegmund was one of three PlaMetCo employees and worked from his "home office in Dallas, Texas."

### RSR's Relationship with Inppamet

Inppamet is a Chilean corporation, engaged in the production of lead anodes for use in mining copper and zinc. In 1994, RSR and Inppamet entered an agreement for Inppamet to manufacture and sell RSR's anodes in South America. Under the terms of the agreement, RSR agreed to provide technical assistance and training to Inppamet related to the manufacture, production, and marketing of RSR's anodes. In return, Inppamet agreed to manufacture the anodes using RSR's processes and pay RSR a fee for each anode it sold. This agreement was terminated in 2000 due to a dispute between RSR and Inppamet.

#### The 2003 Agreement

Following resolution of the dispute, RSR and Inppamet entered into a new agree-

ment, dated February 1, 2003 (the 2003 Agreement). Like the previous agreement, RSR agreed to provide Inppamet with "assistance in the marketing, use, and sale of Anodes," and Inppamet agreed to manufacture the anodes in a good and workmanlike manner and pay RSR a fee for each anode sold in South America. Also like the previous agreement, several terms of the 2003 Agreement centered on Inppamet's access to and the protection of RSR's confidential information. Inppamet acknowledged that "by virtue of receiving RSR's assistance in the marketing, use, and sale of Anodes, INPPAMET may receive and/or have access and be privy to certain RSR proprietary and Confidential Information." The 2003 Agreement also defined "Confidential Information" broadly to mean "without limitation, proprietary information of RSR not publicly known, which RSR designates as being confidential" and included "information relating to the marketing, use, sale, or disposal of Anodes sold by INPPAMET. . . ." Inppamet agreed it was "not entitled to provide to, or share with, third parties information or data related to the Confidential Information received by [it], and [was] not . . . allowed to authorize any person, company or firm to use such Confidential Information, except for INPPAMET's sales purposes. . . ." The 2003 Agreement provided further:

> All original texts and copies of written materials, including documents, reports, diskettes, cassettes, lists and other documents created and prepared for INPPAMET in conformity with this Agreement will be and will remain the property of RSR and . . . will not be used for the performance of any other contract by INPPAMET without the prior written consent of RSR.

To "maintain the confidential nature of the Confidential Information supplied by RSR," Inppamet had the obligation to "keep complete and accurate records relating to the sale" of RSR anodes.

The 2003 Agreement prescribed Texas as the choice of law and included a consent-to-jurisdiction clause, which provided:

> The parties hereby submit to the jurisdiction of any State court or Federal court of the United States of America sitting in Dallas, Texas, U.S.A., and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, and each of the parties agree that all claims in respect of any action or proceeding may be heard and determined in such State court or, to the extent permitted by law, in such Federal court. Each of the parties agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions, including Chile, by suit on the judgment or in any other manner provided by law.

With respect to venue, RSR and Inppamet agreed to waive "any objection which [they] may have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement," as well as the defense of an inconvenient forum.

According to RSR, Siegmund was its main liaison with Inppamet, and he "personally provided direct assistance to Inppamet" under the 2003 Agreement. Quemetco and PlaMetCo were not parties to the 2003 Agreement.

### The 2007 Agreements

Four years later, RSR and Inppamet contemplated the possible acquisition of Inppamet by RSR or one of its affiliates. As part of the due diligence phase, two nearly-identical confidentiality agreements were signed (collectively, the 2007 Agreements). Siegmund signed the first agreement, dated January 25, 2007, as president of Quemetco. That agreement between

Quemetco and Inppamet considered the acquisition of Inppamet by Quemetco or one of its affiliates. The second agreement, dated August 24, 2007, was between Inppamet and Eco–Bat Technologies Limited, another Quexco subsidiary, and considered the acquisition of Inppamet by Eco–Bat or one of its affiliates. While the provisions of the 2007 Agreements applied to affiliated entities of Quemetco and Eco–Bat, the provisions did not apply to any affiliate of Inppamet, such as PlaMetCo.

The purpose of the 2007 Agreements was to outline Quemetco's and Eco–Bat's obligations, including their affiliates, with respect to the use and disclosure of Inppamet's non-public information. The 2007 Agreements acknowledged that Quemetco and Eco–Bat would have access to Inppamet's confidential information and limited their use of such information to "considering, evaluating, and negotiating [the] possible transaction" with Inppamet. The 2007 Agreements also prohibited Quemetco and Eco–Bat from disclosing Inppamet's confidential information to any other person. "Person" was defined to include "any individual, corporation, partnership, entity, group, tribunal, or governmental authority." "Confidential Information" was defined as "any information relating to [Inppamet] or any subsidiary or other affiliate of [Inppamet] that is or has been made available to [Quemetco or Eco–Bat] or any Representative of [Quemetco or Eco–Bat] by or on behalf of [Inppamet] or any Representative of [Inppamet]." The 2007 Agreements provided no similar protections related to Quemetco's, Eco–Bat's, or their affiliates' confidential information.

The 2007 Agreements also contained a three-year non-solicitation clause prohibiting Inppamet, Quemetco, and Eco–Bat from soliciting, requesting, inducing, or influencing any management employee of Inppamet, Quemetco, or Eco–Bat "to leave his or her employment with the other party." Further, they were prevented from employing or otherwise contracting for the services of any management employee of the other party. This clause remained in effect regardless of whether the parties completed the acquisition.

The 2007 Agreements designated Chile as the choice of law; similarly, Santiago, Chile was designated as the forum for disputes, as follows:

> All disputes hereunder … shall be settled in the courts of the Republic of Chile, with Santiago as due venue and each party to this letter agreement waives any objection to proceedings in such courts whether on the grounds that the proceedings have been brought in an inconvenient forum or otherwise.

In 2008, after due diligence and negotiations, neither Quemetco nor Eco–Bat, or any of their affiliates, reached an agreement to purchase Inppamet.

### Procedural History

In October 2008, RSR and Quemetco filed suit against Siegmund, Inppamet, and PlaMetCo, alleging various causes of action, including breach of the 2003 Agreement, breach of fiduciary duties, civil theft, misappropriation of trade secrets and confidential information, statutory theft of trade secrets, tortious interference, and civil conspiracy. In their third amended petition, which is their live pleading, appellants alleged "Siegmund and Inppamet betrayed their fiduciary obligations to [appellants] for their own gain," and "[a]long with the other Defendants, Siegmund and Inppamet conspired to steal business opportunities belonging to [appellants] by using the very confidential data … entrusted to them." According to appellants, the business opportunities concerned a joint venture to establish an anode production facility in Thailand, as well as a potential

joint venture with a Chinese company. Appellants charged Siegmund and Inppamet with subverting the potential joint venture with the Chinese company to secure the opportunity for Inppamet. Appellants also asserted that in the course of Inppamet's negotiations with the Chinese company, Inppamet and Siegmund disclosed RSR's confidential information because "[t]hey realized that the success of [the joint venture] ultimately depended on its ability to replicate RSR's world-class standards for manufacturing electrowinning anodes and servicing clients." According to appellants, the proposed joint venture listed Inppamet as receiving a 20% share in the joint venture and Siegmund as receiving a 10% share. After filing suit, RSR sent written notice to Inppamet that it was exercising its right to terminate the 2003 Agreement for cause. In its notice, RSR claimed Inppamet had violated the 2003 Agreement's confidentiality provisions by providing RSR's confidential information to third parties without RSR's consent and allowing such information to be used for non-sales purposes.

On November 28, 2008, after appellants filed the lawsuit that is the subject of this appeal, Inppamet filed three separate lawsuits against various defendants, including RSR, Quemetco, and Eco–Bat, in a court located in Santiago, Chile. In the Chilean lawsuits, Inppamet sought to enforce Eco–Bat's offer of purchase and alleged, among other things, that defendants breached the 2007 Agreements by retaining and improperly using Inppamet's confidential information, which they obtained during the due diligence process. Thereafter, Inppamet also responded by letter to RSR's notice terminating the 2003 Agreement, asserting "the actual reason for RSR attempting to [terminate the 2003 Agreement was] to avoid the [2003] Agreement's restriction against RSR competing in the South American market and to allow RSR to compete in South America using the confidential information of Inppamet that was shared with RSR during the due diligence process." Inppamet further claimed in the response that RSR's "actual reason" for termination involved "disputes relating to and arising out of the 2007 Confidentiality Agreements which provide for mandatory jurisdiction and venue in Chile." Inppamet's claims under the 2007 Agreements are pending in Santiago, Chile.

In response to RSR and Quemetco's suit made the subject of this appeal, Inppamet filed a special appearance, as well as motions to dismiss based on the Chilean forum-selection clause contained in the 2007 Agreements and the defense of improper and inconvenient forum. PlaMetCo also filed a special appearance and thereafter filed its own motion to dismiss, which incorporated Inppamet's arguments and authorities. Siegmund also joined in Inppamet's motions.

On April 30, 2009, the trial court heard argument on the special appearances and motions to dismiss. No party submitted live testimony; rather, all parties relied on affidavits and other evidence filed in connection with their respective motions and responses. The parties' arguments focused on the application of the respective jurisdictional clauses in the 2003 and 2007 Agreements. Inppamet argued on behalf of PlaMetCo and Siegmund and urged that appellants' claims were for wrongfully hiring Andreas Siegmund. Inppamet argued the 2003 Agreement was inapplicable because it contained no hiring prohibition. Reasoning further, Inppamet claimed that because the 2003 Agreement was restricted to a particular type of anode in South America, any allegation dealing with disclosure of confidential information related to a different anode in China fell outside that agreement. Inppamet insisted the case must be dismissed because the dis-

pute in reality invoked the provisions of the 2007 Agreements, which designated Chile as the forum.

In response, appellants agreed that the trial court had no subject-matter jurisdiction if the 2007 Agreements, and thus the Chilean forum-selection clause, were applicable to their claims. They argued, however, that their claims were based on the wrongful taking and use of confidential information under the 2003 Agreement. Appellants explained "[i]t's not that they hired [Siegmund] away.... It's that they conspired with him before he left our employment for several years to steal our confidential information. And then in continuation of that unlawful conspiracy, they hire[d] him away to continue using our confidential information." Appellants asked the trial court to "read [their] third amended petition" to see what they had pleaded; thus, the 2007 Agreements did not apply.

Following the hearing, the trial court signed an order granting the special appearances filed by Inppamet and PlaMetCo and dismissed all claims against them. The trial court also signed an order granting the motions to dismiss, including Siegmund's joinder, and dismissed the case "based on the forum selection clause of the 2007 Agreements as asserted in the Motions and on the doctrine of forum non-conveniens." Although the trial court specified in the dismissal order the basis for its rulings, it did not issue fact findings or legal conclusions with respect to either order.

## DISCUSSION

In their first issue, appellants contend the trial court erred in concluding it lacked personal jurisdiction over Inppamet and PlaMetCo.

## Law of Personal Jurisdiction

■■■■ Texas courts may exercise personal jurisdiction over a nonresident defendant if (1) the Texas long-arm statute permits the exercise of jurisdiction; and (2) the assertion of jurisdiction is consistent with federal and state constitutional due process guarantees. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex.2007). Under the Texas long-arm statute, Texas courts may exercise jurisdiction over nonresident defendants that do business in Texas. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 2008); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex.2002). The long-arm statute provides a non-exclusive list of what constitutes "doing business" in Texas, including (1) contracting with a Texas resident and either party is required to perform the contract, in whole or in part, in Texas; (2) committing a tort in Texas; or (3) recruiting Texas residents for employment, both in and out of the state. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042; *BMC Software*, 83 S.W.3d at 795. This broad "doing business" language in the long-arm statute allows a court's jurisdiction to " 'reach as far as the federal constitutional requirements of due process will allow.' " *Kelly*, 301 S.W.3d at 657 (quoting *Moki Mac*, 221 S.W.3d at 575). Personal jurisdiction is consistent with due process guarantees "when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with 'traditional notions of fair play and substantial justice.' " *Moki Mac*, 221 S.W.3d at 575 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

■■■■ Minimum contacts are established when the nonresident defendant "purposefully avails itself of the privilege

of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005). "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002).

■■■ A defendant's contacts with a forum can give rise to either specific or general jurisdiction. *BMC Software,* 83 S.W.3d at 795–96. Specific jurisdiction is established if the defendant's alleged liability arises out of or relates to the defendant's contacts with the state. *Id.* at 796. When specific jurisdiction is alleged, the minimum-contacts analysis focuses "on the 'relationship among the defendant, the forum[,] and the litigation.' " *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 338 (Tex.2009) (quoting *Moki Mac,* 221 S.W.3d at 575–76). This analysis requires the court to review whether (1) the defendant purposefully availed itself of the privilege of conducting activities in the forum state, and (2) the facts of the litigation bear a substantial connection to the defendant's contacts with the state. *Moki Mac,* 221 S.W.3d at 578–79. There are three aspects to the "purposeful availment" inquiry. *See Michiana,* 168 S.W.3d at 785. First, only the defendant's contacts with the forum state count, not the unilateral activity of another. *Id.* Second, the contacts relied upon must be "purposeful," rather than "random, isolated, or fortuitous." *Id.* (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). Third, the nonresident defendant must "avail" itself of the jurisdiction by seeking some

benefit, advantage, or profit. *Id.* ("Jurisdiction is premised on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there."). In contrast, general jurisdiction is established if the defendant has made continuous and systematic contacts with the forum, regardless of whether the defendant's alleged liability arises from those contacts. *Moki Mac,* 221 S.W.3d at 575. This minimum-contacts analysis is more demanding than with specific jurisdiction. *Am. Type Culture Collection,* 83 S.W.3d at 807.

■■■ Even if minimum contacts are present, a trial court may not exercise personal jurisdiction over a nonresident defendant if it would offend traditional notions of fair play and substantial justice. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County,* 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Whether the court's exercise of personal jurisdiction over a nonresident defendant is reasonable depends on several factors, including (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining efficient resolution to controversies; and (5) the shared interest of the several states in furthering substantive social policies. *Id.* "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 231 (Tex.1991).

## Special Appearances

### *Standard of Review & Burdens of Proof*

■■■ Because the question of whether a trial court has personal jurisdiction

over nonresident defendants is one of law, we review de novo the trial court's determination of a special appearance. *Kelly,* 301 S.W.3d at 657; *Capital Tech. Info. Servs., Inc. v. Arias & Arias Consultores,* 270 S.W.3d 741, 748 (Tex.App.-Dallas 2008, pet. denied) (en banc). When faced with questions of personal jurisdiction, a trial court frequently must resolve fact questions before deciding the jurisdictional question. *BMC Software,* 83 S.W.3d at 794; *Capital Tech.,* 270 S.W.3d at 748. If a trial court enters an order granting or denying a special appearance but issues no findings of fact or conclusions of law in support of its ruling, all facts necessary to support the judgment and supported by the evidence are implied. *Moki Mac,* 221 S.W.3d at 574; *BMC Software,* 83 S.W.3d at 795. When the appellate record includes the clerk's and reporter's records, the trial court's implied findings are not conclusive; rather, they may be challenged for legal and factual sufficiency on appeal. *BMC Software,* 83 S.W.3d at 795. In a legal sufficiency review, if there is more than a scintilla of evidence to support the factual finding, the legal sufficiency challenge fails. *Id.* (citing *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992)). We review de novo a trial court's legal conclusions. *Id.* at 794.

 In a challenge to personal jurisdiction, a plaintiff and defendant bear shifting burdens of proof. *Kelly,* 301 S.W.3d at 658. The plaintiff bears the initial burden of pleading jurisdictional facts sufficient to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Id.; Capital Tech.,* 270 S.W.3d at 748. If the nonresident defendant challenges jurisdiction through a special appearance, it then bears the burden of negating all bases of personal jurisdiction alleged by the plaintiff. *Kelly,* 301 S.W.3d at 658; *Moki Mac,* 221 S.W.3d at

574. The nonresident defendant "can negate jurisdiction on either a factual or legal basis." *Kelly,* 301 S.W.3d at 659. To negate jurisdiction on a factual basis, the defendant can produce evidence showing it has no contacts with Texas, disproving the plaintiff's allegations; the plaintiff may respond with its own evidence. *Id.; Assurances Générales Banque Nationale v. Dhalla,* 282 S.W.3d 688, 695 (Tex.App.-Dallas 2009, no pet.). To negate jurisdiction on a legal basis, the defendant can establish that even taking the plaintiff's alleged facts as true, "the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Kelly,* 301 S.W.3d at 659.

### *Inppamet's Special Appearance*

Appellants first contend the trial court erred in granting Inppamet's special appearance because Inppamet (1) expressly consented to jurisdiction in Dallas, Texas when it signed the 2003 Agreement, and (2) is subject to personal jurisdiction in Texas based on the Texas long-arm statute because Inppamet purposefully established minimum contacts with Texas. We begin with appellants' first argument.

Implied in the trial court's order on the special appearances is the conclusion that appellants' claims fell within the scope of the 2007 Agreements' forum-selection clause. The trial court stated specifically in its order on the motions to dismiss that it was dismissing appellants' suit based, in part, on that clause. Appellants maintain, however, that they assert no claim that arises under the 2007 Agreements. Rather, they contend their allegations that Inppamet and Siegmund wrongfully disclosed

and used appellants' confidential information and conspired with PlaMetCo to disclose appellants' confidential information are based on breaches of contractual and fiduciary duties under the 2003 Agreement and Siegmund's employment agreements. Appellants argue these claims fall within the scope of the consent-to-jurisdiction clause in the 2003 Agreement and the trial court had personal jurisdiction of Inppamet by virtue of its express consent. Because our analysis of the jurisdictional claims includes the forum-selection clauses, we begin with a review of the law applicable to those clauses.

## 1. Law on Forum–Selection Clauses

Forum-selection clauses are contractual arrangements whereby parties agree in advance to submit their disputes for resolution within a particular jurisdiction. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 473 n. 14, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *see also Phoenix Network Techs. (Eur.) Ltd. v. Neon Sys., Inc.,* 177 S.W.3d 605, 611 (Tex.App.-Houston [1st Dist.] 2005, no pet.) ("A forum-selection clause is a creature of contract."). In Texas, forum-selection clauses are generally considered valid and enforceable, unless enforcement is shown to be unreasonable and unjust. *In re Int'l Profit Assocs., Inc.,* 274 S.W.3d 672, 675 (Tex. 2009) (per curiam) (orig.proceeding); *Phoenix Network Techs.,* 177 S.W.3d at 611 (citing *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)). "[E]nforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system," such as sparing litigants the time and expense of pretrial motions to determine the proper forum for disputes. *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 33, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (Kennedy, J., concurring); *see also Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 594, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); *Phoenix Network Techs.,* 177 S.W.3d at 611.

Before we may enforce a forum-selection clause, we must determine whether the clause applies to the claims asserted in the lawsuit. *Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.,* 234 S.W.3d 679, 687–88 (Tex. App.-Houston [14th Dist.] 2007, pet. denied) (citing *Marinechance Shipping, Ltd. v. Sebastian,* 143 F.3d 216, 221–22 (5th Cir.1998)); *My Café–CCC, Ltd. v. Lunchstop, Inc.,* 107 S.W.3d 860, 866 (Tex. App.-Dallas 2003, no pet.). To do this, we make a "common-sense examination of the claims and the forum-selection clause to determine if the clause covers the claims." *In re Int'l Profit Assocs., Inc.,* 274 S.W.3d at 677. Because forum-selection clauses are creatures of contract, we apply principles of contract interpretation. *See Phoenix Network Techs.,* 177 S.W.3d at 615; *Sw. Intelecom, Inc. v. Hotel Networks Corp.,* 997 S.W.2d 322, 324–25 (Tex.App.-Austin 1999, pet. denied). In construing the jurisdictional clause, our goal is to ascertain the true intent of the parties as written in the agreement. *Sw. Intelecom, Inc.,* 997 S.W.2d at 324. Thus, we give terms their plain, ordinary, and generally accepted meaning unless the contract shows otherwise. *See Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 662 (Tex. 2005).

## 2. Applicability of the Forum–Selection Clauses to Appellants' Claims

The scope of the 2007 Agreements' forum-selection clause is different from the scope of the 2003 Agreement's consent-to-jurisdiction clause. The forum-selection clause contained in the 2007 Agreements applies to "[a]ll disputes hereunder" and provides that those disputes

that cannot be amicably settled, "be settled in the courts of the Republic of Chile. . . ." According to its plain meaning, "hereunder" means "under this agreement" or "in accordance with the terms of this document." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1059 (1981); *see also* BLACK'S LAW DICTIONARY 726 (6th ed.1990) (defining "hereunder" as "directing attention to matter therein which follows in such document or is contained therein."). By definition, the word "hereunder" suggests a direct relationship between the agreement and the disputes, and it limits application to actions that have arisen as a result of the 2007 Agreements. *See, e.g., Terra Int'l, Inc. v. Miss. Chem. Corp.,* 119 F.3d 688, 693–94 (8th Cir.1997) (explaining use of the word "hereunder" to mean "under this Agreement"); *William Noble Rare Jewels ex rel. William Noble, Inc. v. Christie's Inc.,* 231 F.R.D. 488, 491 (N.D.Tex.2005) (interpreting forum selection clause providing "any dispute hereunder" as applying to claims that arise as a result of the contract); *Picken v. Minuteman Press Int'l, Inc.,* 854 F.Supp. 909, 911 (N.D.Ga.1993) (" 'Hereunder' refers to the relations that have arisen as a result of this contract."); *Hoffman v. Minuteman Press Int'l, Inc.,* 747 F.Supp. 552, 559 (W.D.Mo.1990) ("The 'hereunder' language in these franchise agreements limits application of the forum selection clause to suits arising under the agreement and seeking enforcement of the agreement."). In other words, the 2007 Agreements' forum-selection clause applies only if appellants are suing on rights or obligations that are created by the 2007 Agreements. *See In re Wilmer Cutler Pickering Hale & Dorr LLP,* No. 05–08–01395–CV, 2008 WL 5413097, at *4 (Tex.App.-Dallas Dec. 31, 2008, orig. proceeding [mand. denied]) (mem.op.).

In contrast, the consent-to-jurisdiction clause contained in the 2003 Agreement applies to "any action or proceeding arising out of or relating to this Agreement" and provides that those claims may be heard in state or federal court sitting in Dallas, Texas. Courts interpreting similar language conclude such clauses are broad and encompass all claims that have some possible relationship with the agreement, including those claims that may only "relate to" the agreement. *Id.; see also Phillips v. Audio Active Ltd.,* 494 F.3d 378, 389 (2d Cir.2007); *My Café–CCC, Ltd.,* 107 S.W.3d at 866 (interpreting "any dispute arising under or in connection with" broadly as encompassing any dispute connected to or relating to the agreement). "The phrase 'relates to,' in particular, is recognized as a very broad term." *In re Wilmer Cutler Pickering Hale & Dorr LLP,* 2008 WL 5413097, at *4 (citing *Kirby Highland Lakes Surgery Ctr., L.L.P. v. Kirby,* 183 S.W.3d 891, 898 (Tex.App.-Austin 2006, no pet.), and *Whitten v. Vehicle Removal Corp.,* 56 S.W.3d 293, 308 (Tex. App.-Dallas 2001, pet. denied)); *see also Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.,* 139 F.3d 1061, 1067–68 (5th Cir.1998) (in context of arbitration clauses, explaining that "in relation to" or "in connection with" language is broad and dispute need only "touch" matters covered by the contract); *TGI Friday's Inc. v. Great Nw. Rests., Inc.,* 652 F.Supp.2d 750, 759 (N.D.Tex.2009) ("Forum selection clauses covering claims 'relating to' an agreement are broad in scope."). Thus, the 2003 Agreement's jurisdictional clause applies if the claims at issue arise under *or* have a connection with the agreement.

Appellants argue the 2007 Agreements' forum-selection clause is inapplicable because the 2007 Agreements are wholly unrelated to their lawsuit. The allegations in their third amended petition include the following: (1) Inppamet's

breach of the 2003 Agreement (Count Two); (2) Inppamet's breach of fiduciary duties by misappropriating and misusing confidential information received as a result of the 2003 Agreement (Count Four); (3) Inppamet's and Siegmund's misappropriation of trade secrets and confidential information received as a result of Siegmund's employment and the 2003 Agreement (Count Seven); (4) Inppamet's and Siegmund's tortious interference with a business opportunity (Count Nine); (5) Inppamet, Siegmund, and PlaMetCo's conspiracy to take, use, and disclose appellants' confidential information received as a result of the 2003 Agreement and Siegmund's employment (Count Ten); and (6) a request for temporary injunction for the purpose of preserving their confidential information received as a result of the 2003 Agreement and Siegmund's employment (Count Eleven). Counts One, Three, Five, Six, and Eight of the petition are alleged against Siegmund. The claims against Siegmund arise from alleged breaches of his non-disclosure or conflicts of interest agreements or his fiduciary obligations by virtue of his employment with appellants.

Inppamet[2] argues the "core issue" in this lawsuit is the wrongful hiring of Siegmund, a claim arising under the 2007 Agreements, and contends appellants engaged in "artful pleading" to avoid falling within the scope of the Chilean forum-selection clause. It asserts the "operative facts" of the litigation are "Siegmund's inducement and hiring; business opportunities in China; and anodes to be used in zinc-electrowinning." Inppamet argues the inducement was the mechanism to get confidential information and that because the 2003 Agreement (1) contains no prohibition against hiring Siegmund, (2) is restricted to the South American territory, and (3) relates to a copper-electrowinning anode, not zinc, appellants' claims "do not actually and substantively relate to the 2003 Agreements."

As support, Inppamet relies on the time-line of events presented in the petition, maintaining these facts overlap with the timing of the potential acquisition of Inppamet and the signing of the 2007 Agreements. It contends RSR's corporate representative testified in a deposition that the wrongful acts occurred in the same time frame and conceded the claims pertained to the alleged inducements for and employment of Siegmund. Inppamet also relies on appellants' application for temporary injunction, seeking to enjoin Siegmund's employment, as well as two interrogatory responses in which appellants acknowledged the 2007 Agreements as the only agreements that prohibited the hiring of Siegmund. Inppamet argues that a reading of appellants' claims "stripped of their labels" reveals no nexus between the causes of action and the 2003 Agreement. We disagree.

The gist of appellants' lawsuit is Inppamet's and Siegmund's alleged use and disclosure of appellants' confidential and proprietary information, which is protected under the 2003 Agreement and Siegmund's non-disclosure agreement. Appellants' claims against PlaMetCo stem from PlaMetCo's involvement in the alleged conspiracy to disclose appellants' confidential information, which was received by virtue of the relationships established with Inppamet in the 2003 Agreement and Si-

---

**2.** We note that PlaMetCo and Siegmund also raise the same arguments as discussed here; Inppamet and PlaMetCo filed a joint brief, and Siegmund filed a brief and presented these arguments in the context of the motions to dismiss based on the forum-selection clause in the 2007 Agreements. Because this section deals with the special appearance of Inppamet, we only refer to Inppamet to avoid confusion.

egmund's employment. The purpose of the request for temporary injunction was to prevent Inppamet, PlaMetCo, and Siegmund from continuing to use and disclose appellants' confidential information to advance their own business interests, including enjoining Inppamet, PlaMetCo, or any related entities from employing Siegmund, who allegedly breached contractual and fiduciary duties related to appellants' confidential information. Thus, the petition tells a story that Inppamet and Siegmund were entrusted with appellants' trade secrets, confidential business information, and proprietary data through their business and employment relationships, and that Inppamet and Siegmund betrayed that trust by wrongfully disclosing that information to third parties and conspiring with PlaMetCo in furtherance of an alleged scheme to thwart appellants' business opportunities. The petition also alleges Inppamet, PlaMetCo, and Siegmund continue to use appellants' confidential information.

Because the forum-selection clause in the 2007 Agreements is narrow in scope, it applies only if appellants are suing on rights or obligations created by the 2007 Agreements. The 2007 Agreements are confidentiality agreements, signed in conjunction with a possible acquisition, and concern the limitations on the use and disclosure of *Inppamet's* confidential information. Importantly, the 2007 Agreements contain no similar protections related to *appellants'* confidential information; the only agreements limiting the use and disclosure of appellants' confidential information are the 2003 Agreement and Siegmund's non-disclosure agreement. While the 2007 Agreements also contain a clause prohibiting the solicitation or hiring of management employees of the other party, appellants do not allege claims for wrongful hiring in breach of the 2007 Agreements. Rather, the allegations of wrong-

ful hiring are part of the details supporting Inppamet's and Siegmund's alleged breaches of contractual and fiduciary duties and the conspiracy to use and disclose confidential information.

We are unpersuaded by Inppamet's limited reading of the petition to restrict the suit to the wrongful hiring of Siegmund in purported breach of the 2007 Agreements. While many of appellants' allegations cover the same time period as the events surrounding the 2007 Agreements, the substance of the allegations arises out of and relates to the ongoing relationships established through the 2003 Agreement and Siegmund's employment. Any argument that the disclosures at issue were allegedly made by Inppamet or PlaMetCo in the course of the negotiation of the acquisition and therefore fall under or relate to the 2007 Agreements ignores the language of those agreements that does not protect or limit disclosure of appellants' confidential information; the agreements provide protection only to Inppamet. Moreover, appellants' responses to interrogatories do not admit the lawsuit concerns rights, duties, or obligations under the 2007 Agreements. The interrogatories asked appellants only to identify any agreement which they contend prohibits or precludes Siegmund from being employed by PlaMetCo or Inppamet. In response, appellants identified the 2007 confidentiality agreements. Similarly, although RSR's corporate representative agreed the petition alleges claims that Inppamet and PlaMetCo induced Siegmund to leave Quemetco, he also explained that the legal protection Inppamet offered Siegmund gave him an opportunity to leave Quemetco and proceed to reveal confidential information to third parties in breach of Siegmund's fiduciary responsibilities.

 While we agree that a litigant cannot avoid a forum-selection clause through

"artful pleading," [3] we disagree with Inppamet's characterization of appellants' claims. That appellants may also have a claim under the 2007 Agreements related to PlaMetCo's hiring of Siegmund does not change the fact that appellants are not suing Inppamet, Siegmund, or PlaMetCo based on any rights created by or spelled out in the 2007 Agreements. *See In re Wilmer Cutler Pickering Hale & Dorr LLP*, 2008 WL 5413097, at *5. We emphasize in reaching this conclusion that the purpose of the special appearance proceeding was to establish the basis of appellants' claims for jurisdictional purposes, not to prove the success of those claims. Therefore, we offer no opinion on the merits of appellants' arguments related to the 2003 Agreement.

After making a common-sense examination of the claims and the relevant jurisdictional clauses, we conclude appellants' claims arise out of or relate to the 2003 Agreement and therefore fall within the scope of the consent-to-jurisdiction clause designating Dallas, Texas as the proper forum. Accordingly, application of the Texas long-arm statute and analysis of Inppamet's contacts with Texas are unnecessary. *See Monesson v. Nat'l Equip. Rental, Ltd.*, 594 S.W.2d 780, 781 (Tex.Civ. App.-Dallas 1980, writ ref'd n.r.e.); *see also Dunne v. Libbra*, 330 F.3d 1062, 1064 (8th Cir.2003) ("The presence of [a permissive forum selection clause in a negotiated contract] avoids the need to rely solely on the traditional minimum contacts analysis by providing a second, stronger basis for jurisdiction thereby minimizing the risk that anything more than a frivolous challenge to jurisdiction may arise."); *Barnette v. United Research Co.*, 823 S.W.2d 368, 370 (Tex.App.-Dallas 1992, writ denied) ("When a party contractually consents to

the jurisdiction of a particular forum, jurisdiction necessarily depends on the validity of the contract."). This is because personal jurisdiction is a "waivable right" and "there are a 'variety of legal arrangements' by which a litigant may give 'express or implied consent to the personal jurisdiction of the court.'" *Burger King Corp.*, 471 U.S. at 473 n. 14, 105 S.Ct. 2174 (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)). To the extent a party has consented to jurisdiction in a particular forum, the trial court's exercise of personal jurisdiction over it does not violate due process even in the absence of contacts with Texas. *Id.; see also CNOOC Se. Asia Ltd. v. Paladin Res. (SUNDA) Ltd.*, 222 S.W.3d 889, 894 (Tex.App.-Dallas 2007, pet. denied) (op. on rehearing) ("A forum-selection clause obtained through freely negotiated agreements does not offend due process, provided it is not unreasonable and unjust.").

Here, we are presented with a valid consent-to-jurisdiction clause in which Inppamet contractually agreed to submit to jurisdiction in state or federal court located in Dallas, Texas. In Texas, a trial court is required to enforce a forum-selection clause unless the party opposing enforcement clearly shows that (1) the clause was invalid because of fraud or overreaching; (2) enforcement would be "unreasonable or unjust"; (3) "enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision"; or (4) "the contractual forum will be so gravely difficult and inconvenient" such that it "will for all practical purposes be deprived of [its] day in court." *M/S Bremen*, 407 U.S. at 15, 92

---

**3.** *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d at 677 (citing *Ginter ex rel. Ballard v. Belcher*, *Prendergast & Laporte*, 536 F.3d 439, 444 (5th Cir.2008)).

S.Ct. 1907; *see also In re ADM Investor Servs., Inc.*, 304 S.W.3d 371, 374–75 (Tex. 2010). Based on the record, we conclude Inppamet has not met its heavy burden. *In re ADM Investor Servs.*, 304 S.W.3d at 375 ("The burden of proof is heavy for the party challenging enforcement.").

First, Inppamet does not assert the clause is invalid because of fraud or over-reaching or that a statute or judicial decision prevents enforcement on public policy grounds. While Inppamet now asserts it is "unfair and unjust" to subject it to jurisdiction in Texas, Inppamet represented to RSR pursuant to the 2003 Agreement that "the agreed forum would not be so inconvenient that enforcing the clause would deprive [Inppamet] of its day in court." *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d at 680 (citing *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 234 (Tex.2008) (per curiam)). We therefore conclude Inppamet is subject to personal jurisdiction in Texas based on its consent to jurisdiction. We sustain appellants' first issue to the extent they complain the trial court erred in granting Inppamet's special appearance.

### PlaMetCo's Special Appearance

PlaMetCo is not a party to the 2003 Agreement; therefore, we analyze whether the trial court can exercise personal jurisdiction over PlaMetCo under the traditional analysis. Appellants assert general and specific jurisdiction on the following grounds: (1) PlaMetCo does business in Texas "by maintaining an office at the residence of its employee, Siegmund"; and (2) PlaMetCo committed torts in Texas as a party to "an unlawful combination and conspiracy." Appellants also alleged "[t]he causes of action asserted herein against PlaMetCo arise from, or are connected with, purposeful acts committed by PlaMetCo in Texas because PlaMetCo entered into an employment agreement with Siegmund, pursuant to which Siegmund performs services for PlaMetCo from his home in Dallas, Texas. . . ."

In support of its special appearance, PlaMetCo submitted the affidavit of its vice president and secretary, Federico Fanta, who averred among other things that PlaMetCo does not have bank accounts or investments in Texas, own or lease property in Texas, or manufacture product in Texas. Fanta also stated that when PlaMetCo sold certain of its assets to a Texas-based limited partnership, PlaMetCo did not travel to Texas in connection with that sale. And, aside from Siegmund, PlaMetCo does not employ, recruit, or solicit Texas residents for employment. Fanta described Siegmund's work out of his home office as an "accommodation" and explained that "[n]one of the work that Siegmund does from his home in Dallas, Texas relates to any manufacture, sale, or solicitation for sale of any product in the state of Texas" and that "PlaMetCo did not gain any advantage or benefit from Siegmund working from his home or living in Texas."

In response, appellants argued PlaMetCo admitted through Fanta's affidavit that it employs a Texas resident, Siegmund, and that Siegmund is able to work for PlaMetCo from his home in Dallas. Fanta testified in his deposition that Siegmund is one of only three PlaMetCo employees. Fanta testified that Siegmund's job is to survey for possible international business opportunities for Inppamet and other companies and that PlaMetCo provides these services to Inppamet through Siegmund. For example, Fanta testified that as part of his employment with PlaMetCo, Siegmund helped organize the joint venture with the Chinese company. Appellants maintain that this testimony concedes Siegmund's work represents a substantial part of PlaMetCo's total business. They also contend PlaMetCo anticipated it

might be subject to jurisdiction in Texas when, in Siegmund's employment contract, it agreed to a forum-selection clause designating Dallas as the chosen forum for resolving disputes related to Siegmund's employment. They further add that the evidence shows PlaMetCo directed telephone calls and e-mails toward Texas for the purpose of recruiting Siegmund.

### 1. General Jurisdiction of PlaMetCo

■ We begin with the question of whether the trial court has general jurisdiction of PlaMetCo because that analysis is dispositive. For general jurisdiction, we look to guidance provided by the United States Supreme Court in *Perkins v. Benguet Consolidated Mining Company*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), and *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). In *Perkins*, the Supreme Court upheld the district court's exercise of general jurisdiction in Ohio over a Philippine corporation. *Perkins*, 342 U.S. at 438, 72 S.Ct. 413. The corporation's president, who was also the general manager and principal shareholder, briefly relocated to his home in Ohio when the corporation's Philippine mining operations were halted during the Japanese occupation of the Philippine Islands. *Id.* at 447, 72 S.Ct. 413. The president maintained an office in Ohio "in which he conducted his personal affairs and did many things on behalf of the company." *Id.* at 447–48, 72 S.Ct. 413. In addition, he kept company files in Ohio, carried on correspondence relating to the company's business, drew and distributed salary checks on behalf of the company, as well as supervised policies dealing with the rehabilitation of the company's Philippine properties. *Id.* at 448, 72 S.Ct. 413. Based on these activities, the Court held "he carried on in Ohio a continuous and systematic

supervision of the necessarily limited wartime activities of the company." *Id.*

In contrast, the Court in *Helicopteros* held that despite numerous contacts with Texas, the Texas contacts did not "constitute the kind of continuous and systematic general business contacts the Court found to exist in *Perkins.*" *Helicopteros*, 466 U.S. at 416, 104 S.Ct. 1868. Important to the Court's holding was the fact that Helicopteros was not authorized to do business in Texas, did not have an agent for service of process in Texas, performed no helicopter operations in Texas and sold no product in Texas, never signed any contract in Texas, never had an employee based in Texas, and never recruited an employee in Texas. *Id.* at 411–12, 104 S.Ct. 1868. In addition, Helicopteros never maintained an office or any records in Texas. *Id.* at 412, 104 S.Ct. 1868.

We also find guidance from *Deloitte & Touche Netherlands Antilles and Aruba v. Ulrich*, 172 S.W.3d 255, 268 (Tex.App.-Beaumont 2005, pet. denied), where our sister court upheld the trial court's exercise of general jurisdiction over a Swiss company called Deloitte & Touche Tohmatsu (DTT). In that case, another Deloitte & Touche entity based in Houston had seconded or loaned employees to perform work on behalf of DTT. *Id.* at 265. DTT argued that because these seconded employees were not salaried employees according to DTT and did not engage in work to develop Texas business or exploit Texas markets, it had no continuous and systematic contacts in Texas. *Id.* 265–66. The court noted, however, that seconded employees are considered employees under Texas law, of DTT, the borrowing employer. *Id.* at 266. The court stated "[a] foreign association that sets up what is, in effect, a permanent office in Texas, and uses this base for conducting out-of-state or global business, could reasonably

anticipate a Texas court may exercise general jurisdiction over the firm." *Id.* The court continued, "[t]hough Texas is not DTT's headquarters, DTT's contacts with Texas are substantial; that is, they are comparable to the activities of a resident business using Texas as a base of operations." *Id.* Based on the nature and quality of DTT's contacts, the court determined DTT had a "physical presence" in Texas sufficient to support general jurisdiction. *Id.* at 267–68.

Based on the record before us, PlaMetCo's contacts are more analogous to those of the defendants in *Perkins* and *Deloitte* than to the defendants in *Helicopteros.* The record establishes that Siegmund, a Texas resident, is one of PlaMetCo's three employees. Fanta testified by deposition that Siegmund performs his work from his home office in Texas. Although PlaMetCo identified Tucson as its principal place of business and listed only a Tucson address as its office in interrogatory answers, Fanta's deposition testimony revealed that the office listed was the address for PlaMetCo's CPA, Wesley Addison, who is not an employee of PlaMetCo. Addison collects rents on property PlaMetCo manages in Arizona. Fanta's testimony further revealed that PlaMetCo's other employee, David Apotaca, also worked from his home office. Thus, other than collecting rents from its CPA's office, PlaMetCo's business is conducted out of the home offices of its employees, Siegmund and Apotaca.[4]

PlaMetCo's interrogatory answers describe the nature and purpose of its business: "PlaMetCo's business focuses at present in providing international marketing and management services outside of Chile, to various companies, as a support for their international development." PlaMetCo's "two main customers" are Inp-pamet and a company called Abtec, S.A., a pipeline engineering company. Fanta testified that Siegmund, whose title is "Director International Business Development," is the only employee who provides services to Inppamet; Apotaca, an "Hydraulic Engineering Consultant," provides services to Abtec.

PlaMetCo suggests in Fanta's affidavit that a factor weighing against jurisdiction is that none of the work Siegmund performs for PlaMetCo from his home in Texas relates to the manufacture, sale, or solicitation for sale of any product in Texas. But based on the evidence presented, that is not PlaMetCo's business or Siegmund's job function. PlaMetCo is a service provider to Inppamet, and PlaMetCo's business focuses on providing international marketing and management services to Inppamet, including, as Fanta testified, helping set up the joint venture opportunity in China. Like DTT in *Deloitte,* Siegmund's home office represents his "base of operations" in which he conducts out-of-state or global business for PlaMetCo. *Deloitte & Touche,* 172 S.W.3d at 266. Through Siegmund's home office and the conduct of Siegmund in doing business for PlaMetCo in Texas, PlaMetCo has an "actual physical presence" in Texas. *See id.* at 268. Regardless of whether allowing Siegmund to work from home is merely an "accommodation" or is viewed by PlaMetCo as a "negative," the record establishes that PlaMetCo maintains an office in Texas through the employment of Siegmund, and Texas is Siegmund's base for PlaMetCo's work. *See id.* PlaMetCo produced no evidence to overcome the fact that, through Siegmund, it has a presence in Texas.

---

4. Fanta is PlaMetCo's third employee. No evidence was presented concerning where he conducts business for PlaMetCo, although his affidavit was notarized in Santiago, Chile.

Turning finally to the nature of jurisdictional contacts, general jurisdiction is appropriate if the nature of a defendant's contacts with the forum is central to its business. *See Lakin v. Prudential Secs., Inc.*, 348 F.3d 704, 709 (8th Cir.2003); *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437–38 (3d Cir. 1987). The evidence shows that PlaMetCo's main business is to search for possible international business opportunities for one client and to provide services for managing construction projects for another client. Siegmund is the sole provider for PlaMetCo's international business development services. PlaMetCo submitted no evidence to show that the work Siegmund did for PlaMetCo from his home office in Texas was not a substantial part of, or that the nature of the work was not central to, PlaMetCo's business. Conversely, the evidence shows Siegmund performed PlaMetCo's business from his home office, where he actively managed one of the company's main clients. That business activity was conducted from Siegmund's Texas base continually and systematically and is of such substantial nature and quality as to justify suit against PlaMetCo in Texas. *Deloitte*, 172 S.W.3d at 268. Thus, we conclude the record demonstrates sufficient minimum contacts to support general jurisdiction over PlaMetCo in Texas.

## 2. Fair Play and Substantial Justice

Our inquiry does not end with minimum contacts. We must also consider whether the exercise of jurisdiction over PlaMetCo offends traditional notions of fair play and substantial justice. *Asahi Metal Indus.*, 480 U.S. at 113, 107 S.Ct. 1026. To make this determination, we look to (1) the burden on PlaMetCo; (2) Texas's interest in adjudicating this dispute; (3) appellants' interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most effi-cient resolution to controversies; and (5) the shared interest of the several states in furthering substantive social policies. *Id.; Capital Tech.*, 270 S.W.3d at 750. According to Fanta's affidavit, "[i]t would be a hardship for PlaMetCo to litigate in Dallas, Texas." We disagree.

Beyond PlaMetCo's conclusory statement, nothing in the record indicates litigation in Texas would be a hardship. PlaMetCo's burden of litigating in Texas is minor given the fact that one of its three employees, Siegmund, lives and works in Texas. Siegmund is already a defendant in this action, and the court's personal jurisdiction over him is not challenged. As discussed, a substantial part of PlaMetCo's business is conducted through Siegmund's Texas office. Service of process on PlaMetCo, according to the petition, was effected by serving Siegmund. As noted by the Supreme Court in *Perkins*, "if an authorized representative of a foreign corporation be physically present in the state of the forum and be there engaged in activities appropriate to accepting service or receiving notice on its behalf, . . . there is no unfairness in subjecting that corporation to the jurisdiction of the courts of that state through such service of process upon that representative." *Perkins*, 342 U.S. at 444, 72 S.Ct. 413.

Texas courts also have an interest in this litigation because of the alleged torts committed against Texas residents. Quemetco is a Texas corporation and both appellants have their primary offices in Texas. Appellants' business related to the 2003 Agreement was conducted in Texas, and their business continues in Texas on an ongoing basis. Considering PlaMetCo's continuous and systematic contacts with Texas, it would not offend any interest of the interstate judicial system to require PlaMetCo to answer claims in Texas. Given that appellants and Texas have legiti-

mate interests in litigating this case in Texas and the burden on PlaMetCo is minor, we conclude the exercise of jurisdiction over PlaMetCo in Texas does not offend traditional notions of fair play and substantial justice. *See Guardian Royal,* 815 S.W.2d at 231.

We conclude the Texas long-arm statute permits the exercise of jurisdiction over PlaMetCo and the assertion of jurisdiction is consistent with notions of fair play and substantial justice. The trial court therefore erred in granting PlaMetCo's special appearance. Accordingly, we sustain appellants' first issue as to PlaMetCo and reverse the trial court's order granting the special appearances of both Inppamet and PlaMetCo.

### Forum Selection

In their second issue, appellants contend the trial court abused its discretion by dismissing their claims against Inppamet, Siegmund, and PlaMetCo based, in part, on the forum-selection clause of the 2007 Agreements. In their third issue, appellants maintain the trial court abused its discretion by dismissing their claims against Inppamet, Siegmund, and PlaMetCo based, in part, on the doctrine of forum non conveniens.

#### *Standard of Review*

"A motion to dismiss is the proper procedural mechanism for enforcing a forum-selection clause that a party to the agreement has violated in filing suit." *Phoenix Network Techs.,* 177 S.W.3d at 610; *see also In re AIU Ins. Co.,* 148 S.W.3d 109, 112 (Tex.2004) (orig.proceeding). We review the trial court's grant of such a motion for an abuse of discretion. *See Phoenix Network Techs.,* 177 S.W.3d at 610. To the extent our review involves the contractual interpretation of a forum-selection clause, which is a legal matter, the standard of review is de novo. *Id.*

Similarly, we review a decision regarding a dismissal under the doctrine of forum non conveniens for an abuse of discretion. *In re Gen. Elec. Co.,* 271 S.W.3d 681, 685 (Tex.2008) (orig.proceeding); *Sarieddine v. Moussa,* 820 S.W.2d 837, 841 (Tex.App.-Dallas 1991, writ denied). The trial court abuses its discretion if it acts in an arbitrary or unreasonable manner, or acts without reference to any guiding rules or principles. *See Simon v. York Crane & Rigging Co.,* 739 S.W.2d 793, 795 (Tex. 1987); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). A trial court does not abuse its discretion when it bases its decision on conflicting evidence and there is evidence in the record that reasonably supports the decision. *See McNeilus Cos., Inc. v. Sams,* 971 S.W.2d 507, 510 (Tex.App.-Dallas 1997, no pet.) (citing *Davis v. Huey,* 571 S.W.2d 859, 861–62 (Tex.1978)).

#### *Forum–Selection Clause in the 2007 Agreements*

The trial court's order on the motions to dismiss states, in part, "this matter is dismissed based on the forum selection clause of the 2007 Agreements as asserted in the Motions...." Implied in the trial court's order is the conclusion that non-signatories to the 2007 Agreements, PlaMetCo and Siegmund, may enforce the agreements' forum-selection clause. Siegmund and PlaMetCo contend they can enforce the clause based on a theory of equitable estoppel, arguing estoppel applies "when a signatory plaintiff sues both signatory and non-signatory defendants based on substantially interdependent and concerted misconduct." We have concluded the 2007 Agreements are inapplicable. We therefore need not decide whether Siegmund and PlaMetCo can enforce that clause as non-signatories.

Based on our conclusion that appellants' claims arise out of or relate to the 2003 Agreement and fall within the scope of the 2003 Agreement's consent-to-jurisdiction clause, and appellants have not sued under the 2007 Agreements, the order dismissing the matter based on the Chilean forum-selection clause is unsupported in the record. We therefore conclude the trial court abused its discretion in dismissing the case based, in part, on the forum-selection clause in the 2007 Agreements. We sustain appellants' second issue.

### *Forum Non Conveniens*

In their third issue, appellants complain about the trial court's decision to dismiss their case based on the doctrine of forum non conveniens. The doctrine of forum non conveniens allows a court to exercise equitable powers to avoid "imposition of an inconvenient jurisdiction on a litigant" upon a court's determination that the convenience of litigants and witnesses and the interests of justice warrant litigating the matter in another forum. *Saried-dine,* 820 S.W.2d at 839; *Van Winkle-Hooker Co. v. Rice,* 448 S.W.2d 824, 826 (Tex.Civ.App.-Dallas 1969, no writ). "Dismissal based on forum non conveniens is appropriate 'when there are sufficient contacts between the defendant and the forum state to confer personal jurisdiction upon the trial court, but the case itself has no significant connection to the forum.'" *In re Omega Protein, Inc.,* 288 S.W.3d 17, 21 (Tex.App.-Houston [1st Dist.] 2009, no pet.) (quoting *In re Pirelli Tire, L.L.C.,* 247 S.W.3d 670, 675 (Tex.2007) (plurality op.)). The defendant bears the burden of invoking the doctrine of forum non conveniens in a motion to dismiss, asking the trial court to dismiss the case in favor of a foreign forum. *Sarieddine,* 820 S.W.2d at 841. That burden generally requires the defendant to prove all the elements. *Id.*

Because the doctrine of forum non conveniens presumes that at least two forums are available to a plaintiff, our first step is to determine whether an alternative forum exists, inquiring whether another forum is "available" and "adequate." *Id.* A forum is "available" if the entire case and all the parties can come within the jurisdiction of that forum. *Id.* A forum is "adequate" if the parties will not be deprived of all remedies or treated unfairly. *Id.* If the defendant demonstrates another available forum exists, the plaintiff must then prove the available forum is inadequate. *Id.*

If an available and adequate alternative forum exists, we must then consider the balance of the relevant private—and public-interest factors. *Id.* at 840 (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). The private-interest factors reflect the private interests of the litigants and include (1) the ease of access to sources of proof; (2) the availability of the compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining the attendance of willing witnesses; (4) all other practical problems, affecting the ease and expense of the case; and (5) issues related to the enforceability of a judgment obtained in the forum. *Id.* at 842; *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. 839. The public-interest factors reflect the interests of the forum and include (1) the burden imposed on the citizens of the state; (2) the burden imposed on the state's court; (3) the general interest in having localized controversies decided in the jurisdiction in which they arose; and (4) the appropriateness in having a diversity case tried in a forum that is familiar with the law that must govern the case. *Sarieddine,* 820 S.W.2d at 843; *Gulf Oil,* 330 U.S. at 509, 67 S.Ct. 839. The defendant bears the burden of establishing the

balance of factors strongly favors dismissal. *Sarieddine,* 820 S.W.2d at 842; *Van Winkle–Hooker Co.,* 448 S.W.2d at 827. This Court has acknowledged that "the doctrine of forum non conveniens should be applied with caution, exceptionally, and only for good reasons." *Van Winkle–Hooker Co.,* 448 S.W.2d at 827. And "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. 839.

The trial court issued no factual findings or legal conclusions with its order on the motions to dismiss. Implied in the portion of the trial court's order related to the doctrine of forum non conveniens are the following legal conclusions: (1) appellants' claims fall within the scope of the 2007 Agreements' forum-selection clause; (2) Santiago, Chile is an adequate alternative forum; and (3) the balance of the private—and public-interest factors strongly favor dismissal. We have already addressed the trial court's conclusion with respect to the applicability of the 2007 Agreements' forum-selection clause to appellants' claims. Therefore, we turn to the inconvenience analysis to determine whether the trial court erroneously concluded Santiago, Chile was a more convenient forum than Dallas, Texas.

We begin with a determination of whether Chile is an available and adequate alternative forum to Texas. *Sarieddine,* 820 S.W.2d at 841. Appellants do not appear to argue that Chile is not an adequate alternative forum. Rather, the thrust of their argument relates to whether Chile is a more convenient forum than Dallas. We therefore conclude appellants did not establish Chile was an inadequate forum, and we focus the inconvenience analysis on the balance of the private—and public-interest factors to determine whether the trial abused its discretion in deciding the balance of these factors strongly favored dismissal of appellants' lawsuit. *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. 839.

 Appellants first assert Inppamet waived the defense of inconvenient forum when it signed the 2003 Agreement. While the 2003 Agreement's consent-to-jurisdiction clause confers personal jurisdiction over Inppamet, "it does not preclude consideration of a motion to dismiss on the theory of forum non conveniens." *Sarieddine,* 820 S.W.2d at 839; *see also Plum Tree v. Stockment,* 488 F.2d 754, 758 n. 7 (3d Cir.1973). Rather, the forum-selection clause is considered as a factor in determining whether the trial court erred by dismissing the case for forum non conveniens. *Sarieddine,* 820 S.W.2d at 839.

Appellants maintain the balance of private- and public-interest factors favor the forum of Texas, and argue Inppamet, PlaMetCo, and Siegmund ignore significant facts that weigh heavily in favor of venue in Dallas, including (1) RSR and Quemetco are Texas residents; (2) Siegmund is a Texas resident; (3) one of PlaMetCo's three employees, Siegmund, performs his work for PlaMetCo in Texas; (4) Inppamet consented to jurisdiction in the 2003 Agreement; (5) the 2003 Agreement is governed by Texas law; (5) many witnesses are present in Texas; (6) Texas has an interest in adjudicating this dispute because it involves the rights of two Texas corporations; and (7) Texas law will govern the disposition of the case. Appellants contend the trial court is required to give substantial deference to a plaintiff's choice of forum, particularly when both appellants are Texas residents.

Inppamet, PlaMetCo, and Siegmund maintain the private interests of the parties will be better served in Chile, arguing (1) access to sources of proof will be easier in Chile than Texas; (2) costs of securing the presence of witnesses will be lower in

Chile; (3) enforceability of the judgment is "as good or better" in Chile; and (4) appellants agreed to mandatory jurisdiction, venue, and application of Chilean law in the 2007 Agreements. They also pointed out that litigation arising under the 2007 Agreements is pending in Chile. Inppamet, PlaMetCo, and Siegmund further maintain the public interests will be better served in Chile, arguing (1) the administrative burden on the Chilean court is less than on Texas courts because of crowded dockets and the need to conserve judicial resources in Texas; (2) Chile has an interest in adjudicating this case because it involves alleged misconduct from the failed acquisition of a Chilean company, the alleged misuse of a Chilean company's confidential information, and the alleged interference with a business opportunity in China by a Chilean company; and (3) Chilean law controls the disposition of the case.

Considering the evidence supporting the parties' positions as to the private—and public-interest factors, it is Inppamet, PlaMetCo, and Siegmund who bear the burden of establishing the balance of factors strongly favoring dismissal. *Id.* at 842; *Van Winkle–Hooker Co.,* 448 S.W.2d at 827. We also recognize that several of Inppamet, PlaMetCo, and Siegmund's private and public interests relate to their position that appellants' claims arise under the 2007 Agreements, and those arguments therefore have no bearing in our balance of the private- and public-interest factors.

With regard to their burden, Inppamet, PlaMetCo, and Siegmund have not produced any evidence showing the balance of private-interest factors strongly favors Chile over Texas as a matter of convenience. Specifically, there is no evidence showing that access to sources of proof is easier in Chile than in Texas. They also have not presented any evidence regarding the location of records or other proof they intend to use at trial, nor have they supported their contention with evidence to discern the volume of such proof, or how difficult and expensive it would be to transport this proof from Chile to Texas. To the contrary, the evidence shows access to proof related to Siegmund's acts would be easier in Texas because he worked for RSR and Quemetco in Dallas; he was the main liaison with Inppamet under the 2003 Agreement. Similarly, Inppamet, PlaMetCo, and Siegmund have not shown how the cost of securing the presence of witnesses will be lower in Chile than in Texas. There is nothing in the record indicating which witnesses they intend to call at trial or any evidence suggesting it would be more difficult and expensive for any witnesses outside of Texas to travel to Texas. Because this lawsuit involves parties located in Texas, Chile, and Arizona, it appears that many witnesses required to testify at trial will have to travel to litigate this case, regardless of whether trial is in Texas or Chile. Moreover, there is no evidence to prove why enforceability of a judgment is "as good or better" in Chile than in Texas. The argument that "RSR and Quemetco have not shown otherwise" is insufficient to meet Inppamet's, PlaMetCo's, and Siegmund's burden of proof.

Inppamet, PlaMetCo, and Siegmund also have not made a sufficient evidentiary showing that the balance of the public-interest factors strongly favors dismissal. They first contend the administrative burden on the Chilean court is less than on Texas courts, but do not demonstrate that "crowded dockets" are a problem in Dallas courts. While we agree that Chile has an interest in adjudicating this case because it involves "the alleged interference with a business opportunity in China by a Chilean company," Chile's interest is no greater than Texas's interest. Arguably, Texas

has a greater interest in adjudicating this dispute because it involves two plaintiff Texas residents and one defendant Texas resident. Both Chilean and Texas courts have an interest in protecting their citizens from misconduct. But Texas's interest is greater in this case as the wrongful conduct alleged by Inppamet involves claims that are not at issue in this lawsuit. Chile has no interest over misconduct by or directed to PlaMetCo.

Finally, Inppamet, PlaMetCo, and Siegmund argue that allowing this case to move forward in Texas "will result in unreasonable duplication or proliferation of litigation" because of the pending suits in Chile filed by Inppamet for breaches of the 2007 Agreements. We are aware that there may be some duplication of litigation and that this may be an inconvenience to the parties. This consideration, however, is not enough to favor Chile as a forum over Texas, particularly given our conclusion that this case involves claims asserted under or relating to the 2003 Agreement rather than the 2007 Agreements. This consideration is also not enough to overcome the deference to be given the plaintiffs' choice of forum. *See Gulf Oil,* 330 U.S. at 508, 67 S.Ct. 839.

 "The doctrine of forum non conveniens should be exercised only in those cases where the balance of factors so strongly favors the defendant that, in the interest of justice, the case should be tried in another forum." *Sarieddine,* 820 S.W.2d at 844. Appellees have the burden to prove these factors. But other than a conclusory statement that it would be "hardship" to litigate in Dallas and presenting an affidavit explaining Inppamet's lack of presence in Texas, we conclude Inppamet, PlaMetCo, and Siegmund have not met their burden to establish the balance of factors strongly favors dismissal. Accordingly, we conclude the trial court

abused its discretion when it dismissed this case based on the doctrine of forum non conveniens. We sustain appellants' third issue. We reverse the trial court's order granting the motions to dismiss.

## CONCLUSION

We conclude the trial court erred in granting the special appearances of Inppamet and PlaMetCo. We also conclude the trial court abused its discretion is dismissing this lawsuit based on the forum-selection clause in the 2007 Agreements and on the doctrine of forum non conveniens. Accordingly, we reverse the trial court's orders granting the special appearances and the motions to dismiss and remand this case for further proceedings.