**Opinion issued August 30, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00922-CV

———————————

**GOLDEN AGRI-RESOURCES LTD., PT SINAR MAS AGRO RESOURCES & TECHNOLOGY TBK, AND PETER ONG, Appellants**

**V.**

**FULCRUM ENERGY LLC, FULCRUM POWER SERVICES, L.P., JESSON A. BRADSHAW, GERARDO P. MANALAC, DOUBLE G HOLDINGS, L.P., AND KIMBERLY J. CASEY, Appellees**

---

**On Appeal from the 234th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-39531**

---

**MEMORANDUM OPINION**

This interlocutory appeal arises from the denial of special appearances filed

by appellants Golden Agri-Resources, Ltd., PT Sinar Mas Agro Resources &

Technology TBK, and Peter Ong. The issues on appeal relate primarily to whether certain contacts with Texas can be attributed to the appellants for purposes of determining personal jurisdiction over them. We conclude that the appellants did not satisfy their evidentiary burden to factually disprove the jurisdictional allegations against them. Legally and factually sufficient evidence was presented in the trial court to support a conclusion that each of the appellants purposefully availed themselves of the privilege of conducting business in Texas. Accordingly, we affirm the denial of the special appearances.

## Background

Golden Agri-Resources, Ltd. ("GAR") is a Mauritian corporation with its principal place of business in Mauritius. GAR is part of a conglomerate of entities known as the Sinarmas Group. GAR, directly or through its subsidiaries, owns palm plantations in Asia and produces various products derived from palm oil such as cooking oil and packaging products. PT Sinar Mas Agro Resources and Technology TBK ("SMART") is an Indonesian corporation with its principal place of business in Indonesia, and it is an indirect subsidiary of GAR. PT Nabati Energi Mas ("NEM"), which is a subsidiary of SMART and a party to the litigation, did not file a special appearance and is not a party to this appeal. Peter Ong is the president and director of NEM, and he is also the managing director of the Sinar

2

Mas Alternative Energy Division of the Sinarmas Group. Collectively, appellants GAR, SMART, and Ong are referred to as the "Sinarmas parties" in this opinion.

Fulcrum Power Services, L.P. ("FPS") is a Texas limited partnership with its principal place of business in Houston, Texas. FPS provides commercial and residential energy management services in Texas, and it buys and sells wholesale electricity. FPS's general partner is Fulcrum Energy, LLC ("Fulcrum Energy"), a Delaware limited liability company. Fulcrum Energy is managed by an executive committee consisting, in part, of the business's founders who are all Texas residents: Gerardo Manalac, Jesson Bradshaw, and Kimberly J. Casey. Bradshaw, Casey, and Double G Holdings, L.P. (which is owned by Manalac) are limited partners of FPS. The appellees—Fulcrum Energy, FPS, Bradshaw, Manalac, Double G Holdings, and Casey—are referred to as "the Fulcrum parties" in this opinion.

In early 2007, Ong met Manalac at an alternative energy convention in Kuala Lumpur, Malaysia. The two men discussed various business opportunities, including the possibility of a joint venture for the production and marketing of palm-oil-based biofuels. During these early negotiations, FPS sent to Ong at NEM a "Confidentiality and Non-Disclosure Agreement." Ong signed the agreement in a signature block which identified him as "Managing Director" of NEM. Soon after that agreement was executed, a "Partnership Cooperation Term Sheet" was

3

drafted. The "Term Sheet" reflects that FPS and NEM "in principal [*sic*] agree to establish a partnership cooperation to construct, operate biodiesel and glycerin refinery plant" and that they "desire to build a business that refines and markets palm-based biodiesel globally through its refineries, logistics, and marketing contracts and assets using a joint venture company established as the vehicle entity." The signature blocks include spaces for Manalac to sign as president of Fulcrum Energy and for Ong to sign as "President Director" of NEM.

The initial negotiations took place by email and telephone. As a final deal approached, Ong and his associates visited Fulcrum Energy's Houston office to negotiate and conduct due diligence. The negotiations resulted in the creation of two new entities and two sets of written agreements: the investment agreements and the biofuel joint venture.

*Investment agreements*. Blue Sky Golden FPS Ltd. ("Blue Sky"), a British Virgin Islands company, was formed in April 2007 as an indirect subsidiary of GAR. Blue Sky is not owned directly or indirectly by either NEM or SMART. Ong became a director of Blue Sky shortly after the company's formation.

Between May and October 2007, Blue Sky executed three share subscription agreements with FPS to acquire several million limited partnership units in FPS, in exchange for approximately $25 million. GAR wired the money for the purchases from its bank account in New York to FPS's bank account in Texas.

4

FPS's limited partnership agreement and Fulcrum Energy's company agreement were amended to admit Blue Sky as a limited partner of FPS with the right to designate a manager to Fulcrum Energy's executive committee. These amendments effectively gave veto power to Blue Sky's designee on the executive committee. Ong was nominated as Blue Sky's designated manager, and he served in that capacity through 2010, traveling to Houston five times to attend executive committee meanings.

*Biofuel joint venture*. In April 2007, Blue Sky Golden Fulcrum Ltd. ("Golden"), a British Virgin Islands company, was formed as another indirect subsidiary of GAR. As with Blue Sky, Golden was not owned directly or indirectly by NEM or SMART, and Ong was nominated as a director of Golden.

In May 2007, Golden executed a biofuels joint venture agreement with Texas-based Fulcrum Biofuels, LLC, a subsidiary of FPS. Under that agreement, Golden promised to supply Fulcrum Biofuels with palm-oil-based biofuel on specified terms. However, according to the Fulcrum parties, Golden never carried out its obligations under that agreement. They allege that soon after the biofuels joint venture agreement was executed, the price of palm oil on the open commodities market rose so much that it became more profitable for the Sinarmas Group to sell it to third parties rather than to Fulcrum Biofuels on the agreed terms.

In 2008, a major customer of FPS, Tara Energy, LLC, became seriously delinquent on debts owed to FPS. In February 2009, the Fulcrum parties proposed to Ong, then Blue Sky's designated manager on the executive committee, that the Fulcrum group should acquire Tara. Ong refused to consent to the transaction. Nevertheless, negotiations between the Fulcrum group and Tara continued through the summer of 2009. According to the Fulcrum parties, Ong ultimately conditioned his consent to the Tara transaction upon the other FPS limited partners purchasing approximately $12.5 million worth of Blue Sky's limited partnership shares in FPS. Under the payment plan, the FPS limited partners agreed to pay 90% of any distributions received from FPS to Blue Sky, and they were given a two-year schedule on which to make payments. The FPS limited partners signed a "Letter Agreement" committing themselves to those terms, and Ong consented to the Tara transaction, which closed in September 2009.

FPS experienced financial difficulties after the Tara transaction and needed to restructure. According to the Fulcrum parties, the Sinarmas Group represented itself as having expertise in restructuring issues because it had endured financial difficulties in the past, and it offered to assist in FPS's recovery. In February 2010, Fulcrum Energy and Blue Sky executed a "Consultancy Agreement." Pursuant to that agreement, Gilbert Viernes, an assistant vice president of SMART, worked in the Fulcrum group's Houston offices for three months. The Fulcrum parties now

allege that the "Consultancy Agreement" was a subterfuge to allow Viernes to gather confidential information in anticipation of eventual litigation.

In June 2010, Blue Sky filed a petition in Harris County district court against Fulcrum Energy, Manalac, Bradshaw, Casey, and Double G Holdings. Blue Sky alleged that FPS failed to properly investigate Tara's financial condition and grossly overpaid to acquire an insolvent company. Blue Sky contends that it was coerced into consenting to the acquisition by the Fulcrum parties' threats of legal action. Blue Sky also alleged other instances of mismanagement, and it claimed that the counterparties to the "Letter Agreement" had defaulted on their payment obligations. The causes of action in the petition included breach of contract, breach of fiduciary duty, and fraudulent inducement. The Fulcrum parties responded with counterclaims against Blue Sky and third-party claims against GAR and Ong. They alleged breach of the biofuels joint venture agreement, breach of the "Letter Agreement" and fraudulent inducement with respect to that agreement, breach of confidentiality and disclosure of trade secrets, breach of the "Consultancy Agreement," and breach of various common-law duties. In amended pleadings, SMART and NEM were joined as a third-party defendants.

The Fulcrum parties alleged that each counterclaim or third-party defendant, individually or through alter egos, had done business in Texas and committed a tort there, in whole or in part. GAR, SMART, and Ong all timely filed special

7

appearances. Blue Sky did not contest the Harris County court's personal jurisdiction over it.

After GAR, SMART, and Ong had filed their special appearances, the Fulcrum parties filed a "Second Amended Counterclaim and Third Party Petition." The Fulcrum parties alleged that from the beginning of these business relationships, agents of the Sinarmas-affiliated entities presented themselves interchangeably as representing the Sinarmas Group, GAR, SMART, and NEM. Thus, according to the pleading, the Fulcrum parties on one side and GAR, SMART, and NEM on the other "committed to do business with each other, and confirmed by oral agreements and writings to each other (the 'Original Agreement' or 'Umbrella Agreement', or 'Contract') the principles on which they would act as partners, pursuant to which they would go into business together . . . ." Each side provided consideration to the other under this putative "Umbrella Agreement": the Fulcrum parties contributed ownership units in their business to the Sinarmas Group, and the Sinarmas Group agreed to develop plants to produce biofuels that would be sold exclusively to Fulcrum Biofuels to market in the United States. The pleading alleged that the first share subscription agreement and biofuels joint venture agreement, both executed in May 2007, simply "cemented their relationship as partners at the parent level." However, according to the pleading, the Sinarmas Group did not perform its obligation to develop the biofuel plants

8

despite the fact that the Fulcrum parties "fully embraced the Sinarmas Group as a full partner in Fulcrum and FPS." The pleading states multiple causes of action including breach of contract, breach of the duties of good faith and loyalty, fraud, and fraudulent inducement.

GAR, SMART, and Ong jointly submitted briefs and exhibits supporting their special appearances. GAR and SMART denied that there was ever any agreement or partnership between them and the Fulcrum parties. They opposed the imputation of the jurisdictional contacts of NEM, Blue Sky, and Golden on an alter-ego theory because they did not exercise control over the internal, day-to-day operations of those entities. They contended that most of the alleged contacts with the Fulcrum parties were in fact made by agents of NEM, Blue Sky, or Golden. GAR and SMART admitted that their agents occasionally communicated with the Fulcrum parties, but they stressed that the purpose of these communications was to satisfy their stock exchange reporting requirements, and thus these contacts were not "substantially related" to the operative facts of the litigation. SMART also admitted that some of its employees—including the assistant vice president, Viernes, who was sent to Houston pursuant to the "Consultancy Agreement" between Fulcrum Energy and Blue Sky—had contacts with the Fulcrum parties, but SMART contended that these employees were seconded to NEM, Golden, or Blue Sky during such times and therefore such contacts were attributable only to

those entities. Ong argued that all of his contacts with the Fulcrum parties were undertaken on behalf of NEM, Blue Sky, or Golden, such that they were not attributable to him individually. GAR, SMART, and Ong also argued that the assertion of personal jurisdiction of the Texas courts over them would offend traditional notions of fair play and substantial justice.

To support their special appearances, GAR, SMART and Ong submitted several exhibits, including the affidavits of Ong, Viernes, GAR's chief accounting officer, and SMART's chief accountant. However, on the Fulcrum parties' objections, the trial court struck portions of the affidavits of GAR's chief accounting officer and SMART's chief accountant. GAR, SMART, and Ong also submitted copies of the various written agreements at issue to show that they were not parties to them.

The Fulcrum parties submitted a joint brief and evidence opposing the special appearances. This response in opposition attempted to demonstrate that representatives of GAR and SMART negotiated and entered into an "Umbrella Agreement" with the Fulcrum parties. The Fulcrum parties' brief to the trial court relied heavily on the affidavit of Manalac, a limited partner of FPS and member of Fulcrum Energy's executive committee. Manalac's affidavit states that Ong and others identified themselves to him as "direct representatives" of GAR and SMART. Manalac averred that he negotiated the "Umbrella Agreement" with

10

these representatives by email and in person in Houston, and that he continued to have communications with GAR's and SMART's representatives over the course of their multi-year business relationship. He identified GAR's CEO as someone whom Ong repeatedly referenced as the ultimate decisionmaker for the Sinarmas Group's investment in the Fulcrum group. Several exhibits were attached to the affidavit:

- A photograph taken of Manalac, Ong, GAR's CEO, and others purportedly showing the signing and commemoration of the "Umbrella Agreement" in GAR's Jakarta headquarters;

- Business cards for Ong and others showing the Sinarmas name and logo;

- Email messages between Manalac, Ong, and others with purported references to GAR's partnership with Fulcrum and the personal involvement of GAR's CEO in decisionmaking regarding the partnership;

- A press release with purported references to GAR's joint venture agreement with Fulcrum;

- Email messages between GAR and SMART employees and Manalac concerning Fulcrum's financial condition and, as stated in one email, "GAR's investment in Fulcrum"; and

- Records and email messages purporting to show that GAR, not Blue Sky, sent wire transfers directly to FPS for purchases of limited partnership units.

The Fulcrum parties contended that there was no evidence that SMART seconded employees to other entities. As to Ong, the Fulcrum parties argued that he directly represented GAR and SMART and that his negotiations and activities in Texas—including membership on Fulcrum Energy's executive committee—are integral to their causes of action and support personal jurisdiction over him.

11

The trial court held a hearing on the special appearances. In the course of that hearing, counsel for the Fulcrum parties stated:

> This is not a case about the subsidiaries, and we're trying to get at the parents through the subsidiaries. We're saying: This [is what] the parents did. This is what Mr. Ong did. . . . We are not doing an alter ego, although, ironically the evidence I submitted to you would show alter ego.

Their counsel stated at a later point:

> But did [GAR, SMART, and Ong] purposely avail themselves? Were these accidental contacts? In specific jurisdiction, they spent a ton of time in their briefing and even, again, today talking about general jurisdiction. We're not asking for general jurisdiction. We're asking for specific jurisdiction only. We don't pretend we have a general jurisdiction argument today.

Following that hearing, the trial court denied the special appearances in a written order. GAR, SMART, and Ong filed a request for findings of fact and conclusions of law, which the trial court also denied. They then filed this accelerated appeal for review of the interlocutory order denying their special appearances. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (West 2008).

## Analysis

### I. Standard of review

Texas courts may assert personal jurisdiction over a nonresident defendant if the Texas long-arm statute authorizes it and the exercise is consistent with federal and state constitutional due process guarantees. *Moki Mac River Expeditions v.*

12

*Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). The long-arm statute authorizes jurisdiction over a nonresident if he does business in this state, meaning that he "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state," or he "commits a tort in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (West 2008). Because the long-arm statute's broad doing-business language allows the statute to reach as far as federal constitutional requirements of due process will allow, the requirements of the long-arm statute are satisfied if an assertion of jurisdiction comports with federal due process guarantees. *Moki Mac*, 221 S.W.3d at 574.

In order to assert personal jurisdiction over a nonresident defendant, there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958). There are three aspects of this requirement. "First, it is only the defendant's contacts with the forum that count: purposeful availment 'ensures that a defendant will not be haled into a jurisdiction solely as a result of . . . the unilateral activity of another party or a third person.'" *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 2183 (1985)). Second, the acts must have been purposeful as opposed to random, isolated, or fortuitous. *Id.*

13

(citing *Burger King*, 471 U.S. at 475, 105 S. Ct. at 2183, and *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S. Ct. 1473, 1478 (1984)).  Third, the nonresident defendant must have sought some benefit, advantage, or profit by availing itself of the forum, because personal jurisdiction is premised on notions of implied consent.  *Id.*

A defendant's contacts with the forum can give rise to either specific or general jurisdiction.  *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002).  For a court to exercise specific jurisdiction, the defendant must have had purposeful contacts with the forum, and the cause of action must arise from or relate to those contacts.  *Id.*  For general jurisdiction, the defendant must have "continuous and systematic" contacts with the state, which is a more demanding level of contact than what is required for specific jurisdiction.  *Id.*  In either case, the defendant's contacts must be such that he should "reasonably anticipate" being haled into a court of the forum state.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980).

In addition to having the necessary quality and quantity of contacts with the state, the assertion of personal jurisdiction must comport with traditional notions of fair play and substantial justice.  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945); *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991).  To negate this requirement, it is

14

incumbent on the defendant to present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Guardian Royal*, 815 S.W.2d at 231 (quoting *Burger King*, 471 U.S. at 477, 105 S. Ct. 2185). "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Id.*

Whether a court has personal jurisdiction over a defendant is a question of law, but the trial court must frequently resolve questions of fact before deciding the jurisdictional question. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). In *Kelly v. General Interior Construction, Inc.*, 301 S.W.3d 653 (Tex. 2010), the Supreme Court of Texas described the shifting burdens of proof that each party bears with regard to a special appearance:

> . . . [T]he plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute. Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special appearance bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff. Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading.
>
> . . . .
>
> The defendant can negate jurisdiction on either a factual or legal basis. Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot

present the trial court with evidence establishing personal jurisdiction. Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Kelly*, 301 S.W.3d at 658–59 (footnotes and citations omitted).

We are mindful that only relevant jurisdictional facts, rather than the ultimate merits of the cause of action, are at issue in a special appearance. *Wright v. Sage Eng'g, Inc.*, 137 S.W.3d 238, 251 n.10 (Tex. App.—Houston [1st Dist.] 2004, pet. denied). Accordingly, the proof necessary to support personal jurisdiction over a nonresident defendant is that the purposeful act was committed in this state. *Id.* When, as in this case, a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the ruling and supported by the evidence are implied. *BMC Software*, 83 S.W.3d at 795. We review these implied findings for legal and factual sufficiency. *Id.* at 794–95.

## II. Sufficiency of contacts to support personal jurisdiction

### a. GAR

In the first issue, GAR challenges the sufficiency of the evidence to establish personal jurisdiction over it. The Fulcrum parties allege that GAR representatives conducted negotiations that led to the purported "Umbrella Agreement" and

16

partnership between GAR and Fulcrum. Their pleading asserts that Ong conducted negotiations on behalf of not just NEM, but also other Sinarmas Group entities, including GAR, and that he traveled to Houston to conduct the negotiations in early 2007. Manalac's affidavit avers that representatives of GAR, including Ong and GAR's CEO, negotiated the terms of the "Umbrella Agreement" and partnership. Several business cards were attached to Manalac's affidavit. On Ong's business card, the "Sinarmas Group" name and logo appears at the top, and he is identified as "Managing Director"; no other entity is identified on the face of the card. Other individuals' business cards similarly show the name and logo of Sinarmas or GAR, without indication of another entity. The Fulcrum parties also submitted the affidavit of Fulcrum Energy's chief financial officer and accompanying exhibits to show that GAR made direct wire transfers from its New York bank account to FPS's Texas bank account.

GAR denies that it participated in the 2007 negotiations or sent employees to Texas, and it further denies that it negotiated or entered into any agreement to form a partnership or business venture with the Fulcrum parties. GAR contends that Ong's negotiations were conducted on behalf of NEM, as demonstrated by the fact that he signed the Confidentiality Agreement and Term Sheet in his capacity as a NEM officer. It points out that the only Sinarmas Group entities that executed written agreements with the Fulcrum parties were NEM, Blue Sky, and Golden.

17

GAR's initial burden in filing its special appearance was to negate the Fulcrum parties' jurisdictional allegations that it, as opposed to another Sinarmas Group entity, negotiated with the Fulcrum parties to allow Blue Sky to purchase shares in FPS. It is undisputed that Blue Sky, GAR's indirect subsidiary, was formed well after initial negotiations had begun, only a couple of weeks before the investment agreements were executed. The timing of Blue Sky's formation suggests that the early negotiations by Ong and others could not have been done for that entity's benefit, which had not yet been formed.

GAR's position is that Ong and others conducted all of the early negotiations on behalf of NEM. There is some evidence to support that position: Ong's affidavit avers that he negotiated on NEM's behalf, and the "Confidentiality and Nondisclosure Agreement" and the "Term Sheet" reflect that Ong signed in his capacity as a NEM officer. However, Ong's business card reflects an affiliation with the "Sinarmas Group," not NEM specifically, and Manalac's affidavit avers that Ong identified himself as representing the Sinarmas Group. It is possible that Ong was the agent of both NEM and GAR, because one may act simultaneously as an agent of two principals if the principals consent and have knowledge of the dual agency. *See, e.g.*, *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 924 (Tex. 2010). Significantly, the two entities formed as a result of Ong's negotiations, Blue Sky and Golden, are not subsidiaries of NEM; they are

18

indirect subsidiaries of GAR. Also, the money for Blue Sky's purchase of limited partnership units in FPS was transferred from a GAR bank account. These facts support an inference that Ong conducted the early negotiations with the Fulcrum parties on behalf of GAR. We conclude that GAR did not conclusively negate, on a factual basis, the jurisdictional allegation that GAR representatives negotiated with the Fulcrum parties the terms of the investment agreements and created Blue Sky as an indirect subsidiary to enter into those agreements with Texas-based counterparties. *See BMC*, 83 S.W.3d at 794–95. Instead, the evidence presented by the Fulcrum parties was legally and factually sufficient to support the trial court's implied finding, for purposes of resolving the jurisdictional dispute, that Ong negotiated on behalf of GAR.

The question remains whether GAR's alleged contacts with the Fulcrum parties would, as a matter of law, support an assertion of personal jurisdiction over GAR. Parties who "'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473, 105 S. Ct. at 2182 (quoting *Travelers Health Ass'n v. Virginia,* 339 U.S. 643, 647, 70 S. Ct. 927, 929 (1950)). In this case, it is undisputed that GAR did not directly enter into any written agreement with any of the Fulcrum parties. To be sure, due process "allows potential defendants to

19

structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen*, 444 U.S. at 297, 100 S. Ct. at 567; *see also Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 377 (5th Cir. 1987) (observing that parties may "structure their transactions to limit their amenability to suits in foreign states"). However, not all transactions involving Texas residents can be structured to avoid any benefit from or availment of Texas law. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 875 (Tex. 2010).

The Fulcrum parties' claims against GAR are based largely on the allegation of an "Umbrella Agreement," which GAR representatives are alleged to have negotiated by telephone, by email, and in person in Houston. The Fulcrum parties also alleged that GAR "unilaterally formed several new foreign entities . . . that it would either directly (if only tacitly) own, or otherwise wholly control through other controlled entities in the Sinarmas Group" for the purpose of producing and marketing biodiesel fuel in the United States. Taken as true, these facts demonstrate the three aspects of purposeful availment that warrant an assertion of personal jurisdiction over GAR: (1) contacts with Texas that are attributable to GAR, (2) that are purposeful, and (3) that sought some benefit, advantage, or profit. *Michiana*, 168 S.W.3d at 785. The creation of a subsidiary for the specific purpose of investing in a Texas limited partnership is the kind of "reach[ing] out beyond one state" to "create continuing relationships and obligations" that support

20

personal jurisdiction. *See Burger King*, 471 U.S. at 473, 105 S. Ct. at 2182; *cf. Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 30–31 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (holding that personal jurisdiction could be maintained over New York resident who formed entity "for the sole purpose of becoming a limited partner" in a Texas limited partnership").

We hold that GAR failed to conclusively negate, as a matter of law, the allegation that it purposefully availed itself of the Texas market by establishing Blue Sky, which had a continuing business relationship with Texas residents. *See BMC*, 83 S.W.3d at 794–95. We further hold that the contacts alleged by the Fulcrum parties are substantially connected to the litigation, and thus specific personal jurisdiction may be exercised over GAR. *See Moki Mac*, 221 S.W.3d at 585. At this procedural juncture, we do not decide whether GAR may be held liable for its alleged conduct on the theories advanced by the Fulcrum parties. *See Wright*, 137 S.W.3d at 251 n.10. Rather, we hold only that there is sufficient evidence to support the trial court's implied preliminary conclusion that GAR had contacts with Texas from which it could "reasonably anticipate" being haled into court to litigate causes of action arising out of those contacts. *See World-Wide Volkswagen*, 444 U.S. at 297, 100 S. Ct. at 567.

**b. SMART**

In the second issue, SMART challenges the sufficiency of the evidence to establish personal jurisdiction over it. One of the Fulcrum parties' specific allegations is that SMART assistant vice president Gilbert Viernes, while working in Fulcrum's Houston offices under the alleged subterfuge of the consultancy contract between Blue Sky and Fulcrum Energy, gathered Fulcrum's confidential information in order to subsequently disclose it through Blue Sky's original petition and undermine the business.

In its trial court briefing supporting its special appearance, SMART argued that it had no contacts with the Fulcrum parties that were substantially connected to the litigation. It contended that an "isolated number" of its employees, including Viernes, were seconded to—that is, borrowed by—NEM, Golden, or Blue Sky, and therefore these contacts were made for the benefit of these other entities. In support of this theory, SMART relies on *Deloitte & Touche Netherlands Antilles & Aruba v. Ulrich*, 172 S.W.3d 255 (Tex. App.—Beaumont 2005, pet. denied), in which the court of appeals held that Texas-based workers seconded to a firm supported general jurisdiction over that firm. *See Deloitte*, 172 S.W.3d at 268. SMART did not argue in the trial court that the consultancy-related activities lacked a substantial connection with the Fulcrum parties' causes of action.

The only evidence presented by SMART to support its secondment theory were the affidavits and accompanying exhibits of Viernes and Tenti Kidjo, SMART's chief accountant. In response to the Fulcrum parties' objections, the trial court struck the portions of Kidjo's affidavit discussing the purported secondments. There was no objection to Viernes's affidavit, and the trial court did not strike any portion of it.

A threshold question is whether the trial court erred in striking the portion of Kidjo's affidavit that avers that certain SMART employees were seconded to other entities. The struck portion of the affidavit concering Viernes's secondment stated as follows:

> An isolated number of SMART employees were seconded to other entities. The following employees were seconded from SMART to other entities:
>
> a) Gilbert Viernes ("Viernes") was seconded to Blue Sky in or about October 2008 to present.
>
> . . . .
>
> SMART did not direct the work for or have control over the seconded employees listed above during the terms of their secondments. The employees performed work on behalf of Blue Sky, Golden, and/or NEM. Any communications between the seconded employees and the Fulcrum Parties was on behalf of the entities that controlled those employees: Blue Sky, Golden and/or NEM. *See, e.g.*, Exhibit 3B, which is attached hereto and incorporated herein by reference.

23

"Exhibit 3B" consisted of emails between various SMART employees and various Fulcrum-related parties, particularly Manalac, and an accounting worksheet titled "SUMMARY OF SHARING COST – PROJECT BIODIESEL DUMAI." None of the attached exhibits expressly state who employed the purportedly seconded employees. However, many of the email messages reflect that the purportedly seconded employees, including Viernes, sent and received messages by way of email addresses ending in "@smart-tbk.com."

The Fulcrum parties objected to the above-quoted portion of Kidjo's affidavit on the grounds that "the statements contained therein are legal conclusions" that "totally fail[] to provide the factual information that could assist the Court in determining the truth of this testimony." The Fulcrum parties' objection also noted that "Kidjo fails to provide a delineation of the existence of a contract of secondment; which company directed the work and paid the salary of the seconded employees; description of the job duties of the seconded employees; or any written memorandum that memorializes the secondment."

We review the trial court's ruling striking an affidavit or portion thereof for an abuse of discretion. *In re BP Prods. N. Am., Inc.*, 263 S.W.3d 106, 117 (Tex. App.—Houston [1st Dist.] 2006, orig. proceeding); *CA Partners v. Spears*, 274 S.W.3d 51, 63 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The Texas Rules of Civil Procedure permit the trial court to determine a special appearance on

24

the basis of affidavits. *See* Tᴇx. R. Cɪv. P. 120a(3). However, such affidavits "shall be made on personal knowledge" and "shall set forth specific facts as would be admissible in evidence." *Id.* This means that the affidavit must be direct, unmistakable, and unequivocal as to the sworn facts, allowing perjury to be assigned on it. *Wright*, 137 S.W.3d at 250 n.8. Affidavit testimony that amounts to a legal conclusion lacks probative force. *See id.* (disregarding specially appearing affiant's testimony that he did not commit a tort in Texas because the statement was a legal conclusion).

There are several factors that are relevant in determining whether an employment relationship exists, including whether a supervisor exercises control over a worker. *See Tex. A&M Univ. v. Bishop*, 156 S.W.3d 580, 584–85 (Tex. 2005) (listing factors relevant to determining whether worker is employee or independent contractor, including "right to control the progress of the work"); *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001) (stating that "determining whether someone exercised actual control is generally a question of fact"). An affidavit that merely asserts the existence of an employment relationship without providing specific supporting facts is not competent evidence of the alleged employment relationship. *See* Tᴇx. R. Civ. P. 120a(3); *AMS Constr. Co. v. Warm Springs Rehab. Found., Inc.*, 94 S.W.3d 152, 157–58 (Tex. App.— Corpus Christi 2002, no pet.) (holding that because affiant failed to provide

25

underlying facts supporting statements that certain persons were employees, the statements were not competent summary judgment evidence). Like the question of whether an employment relationship exists, whether an employee is seconded to a borrowing employer is a question of a law that depends upon factual determinations of whether the borrowing employer has the right to direct and control the borrowed employee with respect to the details of the particular work. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 537 (Tex. 2003) (observing that whether employee is borrowed employee of another in fact hinges on right of control). Thus, an affidavit that states that an employee is seconded to a borrowing employer, without providing specific supporting facts, is conclusory and lacks probative force. *See* TEX. R. Civ. P. 120a(3); *Wright*, 137 S.W.3d at 250 n.8.

Kidjo's affidavit states that certain SMART employees were seconded to other entities who "controlled" those employees. However, the statements concerning secondment are legal conclusions lacking probative force since the affidavit provides no underlying facts concerning the nature of the control purportedly exerted by the other entities. *See Wright*, 137 S.W.3d at 250 n.8; *AMS*, 94 S.W.3d at 157–58. Moreover, the contents of the referenced "Exhibit 3B" attached to Kidjo's affidavit do not indicate specific facts concerning the other entities' control over the purportedly seconded employees. Accordingly, we hold that the trial court did not err by striking those portions of Kidjo's affidavit

26

concerning the purported secondment of certain SMART employees. *See In re BP Prods.*, 263 S.W.3d at 117.

SMART also relies upon Viernes's affidavit to show that he was seconded to Blue Sky when made his contacts with the Fulcrum parties in Texas. Viernes averred that he was seconded by SMART to Blue Sky, and he repeatedly stated that all of his activities relating to the Fulcrum parties were undertaken "on behalf of" and "for the benefit of" Blue Sky rather than SMART. However, as with Kidjo's affidavit, facts demonstrating Blue Sky's control over the details of his work were not provided. It appears that no portion of Viernes's affidavit was objected to or struck by the trial court. Nevertheless, conclusory affidavit testimony is substantively defective despite the lack of an objection in the trial court. *See Haden v. David J. Sacks, P.C.*, 332 S.W.3d 503, 512 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We conclude that, as with Kidjo's affidavit, Viernes's affidavit statements concerning his secondment are conclusory because they are not supported by specific facts, and therefore they were not competent evidence. *See* TEX. R. CIV. P. 120a(3).

Having failed to present competent evidence that Viernes was seconded to other entities, we hold that SMART did not meet its special appearance burden to negate specific personal jurisdiction on the grounds that it lacked contacts with

Texas that are connected to the operative facts of the litigation. *See Kelly*, 301 S.W.3d at 658–59.

### c. Ong

In the third issue, Ong challenges the sufficiency of the evidence to establish personal jurisdiction over him. Ong's defense to personal jurisdiction is that all of his contacts with the Fulcrum parties were made in his capacity as an agent of other entities, and thus his contacts are not attributable to him individually.

The mere fact that a person was acting in the capacity of a corporate representative does not insulate that person from personal jurisdiction arising from such actions. *Gen. Elec. Co. v. Brown & Ross Int'l Distribs., Inc.*, 804 S.W.2d 527, 532 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (citing *Calder v. Jones*, 465 U.S. 783, 790, 104 S. Ct. 1482, 1487 (1984)). However, under the fiduciary shield doctrine, a corporate officer or employee is protected from being subjected to the general jurisdiction of a forum when all of that individual's contacts with the forum state were made on behalf of his employer. *See, e.g.*, *Wright*, 137 S.W.3d at 250. Because the fiduciary shield doctrine is limited to the exercise of general jurisdiction, it does not protect a corporate officer or employee from an allegation of specific personal jurisdiction when the opposing party has alleged intentional torts or fraudulent acts for which he may be held individually

28

liable. *Id.*; *TexVa, Inc. v. Boone*, 300 S.W.3d 879, 889 (Tex. App.—Dallas 2009, pet. denied).

In *Wright v. Sage Engineering, Inc.*, 137 S.W.3d 238 (Tex. App.—Houston [1st Dist.] 2004, pet. denied), a Texas corporation with its principal place of business in Houston designed, manufactured, and sold equipment used in offshore oilfield production. *Wright*, 137 S.W.3d at 244. One of the Texas corporation's shareholders was a foreign entity whose sole director was a Swiss resident. *Id.* After the foreign-entity shareholder was sold to a third party, the Texas company and its other shareholders filed suit against the individual director of the foreign entity, alleging that he had stolen designs for certain oilfield equipment. *Id.* The causes of actions included misappropriation of trade secrets, breach of fiduciary duty, unjust enrichment, breach of contract, conversion, conspiracy, fraud, and fraudulent inducement. *Id.*

The individual defendant filed a special appearance, arguing that because all the alleged acts were undertaken in his capacity as a corporate representative of the foreign entity, he lacked minimum contacts with Texas. *Id.* at 249–50. This court observed that because the causes of action were based upon the individual's alleged misrepresentations for which he could be held individually liable, the fiduciary shield doctrine was not available as a defense to the Texas courts' exercise of specific personal jurisdiction over him. *Id.* at 250. Accordingly, the

29

individual defendant was held to have not satisfied his burden of negating specific personal jurisdiction. *Id.*

Regarding the applicability of the fiduciary shield doctrine, *Wright*'s factual and procedural setting is analogous to this case. Like the plaintiffs in *Wright*, the Fulcrum parties have alleged various tort claims against Ong, a manager of Fulcrum Energy's executive committee, including that he fraudulently induced the execution of the "Letter Agreement," breached his duty of confidentiality and divulged trade secrets, breached his fiduciary duty as a manager of Fulcrum Energy's executive committee, conspired to assist GAR and SMART to breach their fiduciary duties, and fraudulently induced the Fulcrum parties to enter into the "Umbrella Agreement." Moreover, like the nonresident defendant in *Wright*, Ong's sole basis for negating personal jurisdiction based upon his contacts with Texas is that he made those contacts solely in a representative capacity. As previously discussed, this is not a meritorious defense to the Fulcrum parties' assertion of jurisdiction. *Id.* Therefore, following *Wright*, we hold that Ong has not satisfied his burden of negating specific personal jurisdiction based upon his contacts with Texas. *Id.*; *see also Kelly*, 301 S.W.3d at 658–59.

## III. Fair play and substantial justice

GAR, SMART, and Ong additionally argue that the exercise of personal jurisdiction over them would offend traditional notions of fair play and substantial

justice. GAR and SMART contended in the trial court that, as foreign companies, they would bear substantial costs by having to defend themselves in Texas. They argued that because they were not parties to any of the agreements at issue, and accordingly they could not anticipate having to litigate claims in the state. They also asserted that Mauritius and Indonesia, their countries of domicile, have an interest in protecting their residents from the authority of foreign courts. Ong made almost identical arguments, and he stressed that the burdens on him are greater given that he is sued in his individual capacity.

In evaluating whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice, we consider: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Guardian Royal*, 815 S.W.2d at 231. The argument that personal jurisdiction should not be exercised for these reasons despite contacts with Texas must be "compelling." *Id.*

We observe that GAR, SMART, and Ong have not actually presented evidence that litigating in Texas would impose a burden on them, despite the fact that they must produce evidence of such a burden to defeat personal jurisdiction on

31

this basis. *Id.*; *see also Kelly*, 301 S.W.3d at 658–59. The fact that they are not located in Texas is insufficient in itself to show that their burden is excessive. *Tempest Broad. Corp. v. Imlay*, 150 S.W.3d 861, 877 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Moreover, Texas has a strong interest in adjudicating the causes of action brought by the Fulcrum parties. *See Wright*, 137 S.W.3d at 254 ("Texas has a strong interest both in providing a forum for its residents and in holding parties who committed tortious acts against its residents accountable."); *Silbaugh v. Ramirez*, 126 S.W.3d 88, 96 (Tex. App.—Houston [1st Dist.] 2002, no pet.) ("Texas has an interest in ensuring that its citizens are protected from breach of contract and tortious acts committed by nonresidents conducting business in Texas."). Also, it is in the interests of international judicial economy that all the claims among these parties be resolved in the same suit. *See Ashdon, Inc. v. Gary Brown & Assocs., Inc.*, 260 S.W.3d 101, 118 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (concluding that the interstate judicial system would benefit from declining jurisdiction when the same parties were already involved in litigation in another state). On balance, the factors relevant to the fair play and substantial justice inquiry favor exercising personal jurisdiction over GAR, SMART, and Ong.

We overrule the first, second, and third issues.

## IV.    Affidavits

GAR, SMART, and Ong argue in their fourth issue that the trial court erred by striking portions of the affidavits of GAR's chief accounting officer and SMART's chief accountant.  Our review of the denial of the appellants' special appearances does not depend upon any of this affidavit testimony except to the extent previously discussed in this opinion.  Our appellate jurisdiction over this interlocutory appeal must be strictly construed as a narrow exception to the general rule that only final judgments and orders are appealable.  *Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 352, 355 (Tex. 2001).

To adjudicate the special appearances of GAR, SMART, and Ong, it is not necessary for us to review the trial court's rulings striking other portions of the contested affidavits.  Given the strict construction of our appellate jurisdiction over an interlocutory order and that we need only address issues necessary to the disposition of the appeal, we overrule the fourth issue.

## Conclusion

We affirm the order of the trial court.


Michael Massengale
Justice

Panel consists of Justices Higley, Bland, and Massengale.